**FIRST DIVISION
DOYLE, C. J.,
PHIPPS, P. J, and BOGGS, J.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**November 20, 2015**

# In the Court of Appeals of Georgia

A15A1281. GLISPIE v. THE STATE.                    DO-045 C

DOYLE, Chief Judge.

In connection with a traffic stop, Jaylend Glispie was convicted of violating the Georgia Controlled Substances Act for possession with intent to distribute cocaine and 3, 4-methylenedioxymethcathinone (methylone) (2 counts),[1] obstruction of a law enforcement officer,[2] fleeing and attempting to elude,[3] failure to stop at a stop sign,[4] and driving an unsafe and improperly equipped vehicle.[5] He appeals from the denial

---

[1] OCGA § 16-13-30 (b).

[2] OCGA § 16-10-24 (b).

[3] OCGA § 40-6-395 (a).

[4] OCGA §§ 40-6-72 (b); 40-6-1 (a).

[5] OCGA § 40-8-7 (a).

of his motion for new trial, arguing that the trial court erred by denying his motion to exclude evidence of text messages purportedly extracted from a cell phone he possessed, denying his motion for a mistrial after a witness gave inadmissible testimony in response to a question propounded by Glispie's trial counsel on cross-examination, and denying his motion to suppress drugs taken from his person during a search. Glispie also contends that the evidence presented at trial was insufficient to support his convictions. For the reasons that follow, we affirm Glispie's convictions for violating the Georgia Controlled Substances Act, obstruction of a law enforcement officer, fleeing and attempting to elude, and driving an unsafe and improperly equipped vehicle. We reverse his conviction for failure to stop at a stop sign because there was no evidence of venue with regard to that charge.

The evidence shows that on February 7, 2013, at about 2:00 a.m., Nathan Watts, a Rockdale County sheriff's deputy, was on patrol in a marked patrol cruiser on Flat Shoals Road when he observed a vehicle without a working headlight in the left turning lane of Salem Road. As Watts continued to travel on Flat Shoals Road, he crossed Salem Road and peered into the vehicle. Watts did not observe any of the driver's facial features, but he did observe that the driver, the sole occupant of the vehicle, was a black male wearing a "bright red[-]like sweater shirt." Watts turned his

2

patrol cruiser around and followed the vehicle, which had turned onto Flat Shoals Road in the opposite direction in which Watts had been traveling.

Watts got behind the vehicle and activated his cruiser's emergency lights and siren to initiate a stop of the vehicle, which then turned onto a side street and stopped. Watts testified that he "aired [his] situation over the radio," reporting his location and giving "a short description of the vehicle," including the tag number and color and body type of the vehicle. Watts then exited his patrol cruiser. As Watts "started moving [toward the vehicle], the vehicle started moving too," and was driven away "in a hurry" before Watts could make contact with the driver. Watts returned to his cruiser, pursued the vehicle, and announced his pursuit over the radio, giving a description of the vehicle and the direction in which it was being driven. When the vehicle proceeded through an intersection without stopping at the stop sign, Watts stopped his cruiser, deactivated its emergency lights, and in the interest of safety, ended his pursuit.

On his computer, Watts obtained the address associated with the driver's license of the registered owner of the vehicle. The address was in Rockdale County, not far from Watts's location, and Watts drove to the residence; approximately seven minutes passed from the time he stopped pursuing the vehicle to the time he arrived

3

at the residence. Deputy Curtis Thompson, who had heard Watts's broadcast, arrived at the residence before Watts. Thompson exited his cruiser and started walking toward the home. The vehicle that Watts had pursued was parked in the driveway, and two black men were in front of the residence. One man wore a white t-shirt and flannel plaid-looking pajama pants. The other man, who wore jeans and a red and black shirt, ducked into some bushes as Thompson's cruiser approached. Thompson testified that as he walked past the vehicle, he could "smell the brakes still burning on the car from it having been in the chase, applying the brakes."

Thompson ordered both men to approach him. The man wearing the white t-shirt complied, but the man wearing the red and black shirt, later identified as Glispie, did not. It appeared that Glispie was "about to run," but Watts approached from behind Thompson at "a different angle in case something happened," and Thompson was able to handcuff Glispie. As Thompson "reached up to start to pat him down[,] . . . [Glispie] tried to take off." Thompson testified that Glispie "stood on his left foot. Picked his right leg up and tried to kick my knee cap out." Thompson stepped to the side, and Glispie's "heel grazed from [Thompson's] knee cap all the way down the side of [Thompson's] leg to [Thompson's] ankle," leaving a red mark. Glispie then "went hopping across the yard with [Thompson] hanging on to the handcuffs."

4

Thompson pulled the handcuffs, "[l]eg swept" Glispie, knocking his feet out from underneath him, and sat down on top of Glispie. Watts positively identified the shirt that Glispie wore in the photograph as the shirt he had seen the driver of the pursued vehicle wearing.

Thompson searched Glispie's pockets. Located therein was one plastic bag containing fourteen rocks of suspected crack cocaine; another plastic bag contained five clear capsules, each filled with a white powder; a "couple of lighters"; two cell phones; some cash; and a razor or box cutter. The rocks had a total net weight of 2.07 grams and later tested positive for cocaine. The capsules had a total weight of less than one gram and later tested positive for 3, 4-methylenedioxymethcathinone, commonly known as methylone or "Molly."

At trial, Thompson opined that the amount of drugs recovered and the manner in which the drugs were packaged were consistent with an intent to sell or distribute, rather than for personal use.[6] A third law enforcement officer, Sergeant Jason Welch, testified that text messages were extracted from one of the cell phones found on

---

[6] Thompson testified regarding his 13 years of experience in law enforcement, as well as his training and experience in narcotics investigation. The trial court ruled that he was "qualified to talk about the way [he] [had] encountered drugs being packaged before, and give [his] opinion as to whether or not they [were] held with intent to distribute or for possession."

Glispie's person, and the texts indicated that Glispie used the cell phone to sell drugs.[7] Welch testified that part of one text message appearing on January 25, 2013, read, "Kristy, this Jaylend." A text message sent from the phone on February 1, 2013, read, "what is good, babe. This is the dude. I got your number. Everybody calls me Sane or Insane but my real name is Jaylend." Welch was asked whether there were conversations he had seen (in the text messages) which were "particularized toward the distribution or sale of either Mollies or cocaine," and he testified as follows.

A: Absolutely. Molly is mentioned numerous times within these pages. I just flip through at random.

Q:
Can you give an example of one of those times?

A: Yes. For instance, you mentioned cocaine. Just flip through a random page. I see this right here. I got some concrete you might like. Hit me when you are ready. That's text number 2433 on January 26th, 2013, at 21:30. That text message was sent to this phone. Basically, someone trying to order up and another one on text message 2479. This was sent to the phone on January 27th, 2013, at 23:59 hours. It states you say a G. which is slang for a gram was 80. And then again from the

_____

[7] Glispie filed a motion in limine to exclude the text messages, but the trial court denied the motion and permitted Welch to testify regarding the messages; the printout of the texts was not sent out with the jury.

same number, I need a G. of Molly. What's the move. Basically, I need a gram of Molly and what are you going to do for me.

Q: Are there any other ones that you found that kind of caught your attention primarily?

A: This individual time, they are talking about a dime. Another one from – now the cell phone data that we use to pull this information, we pull contacts too. Some of the numbers are just numbers, random customers ordering up to the phone but other people are listed as contacts. This was sent from an individual they have as Little Rod. It's 2599 sent to the phone and it plainly reads, you got Mollies? Asking if the individual has Mollies.

Welch also testified as to other text messages "about the drug trade." On cross-examination, Welch testified that based on his knowledge, training, and experience, "[anyone in possession of narcotics, especially in a manner of intent to sell and has a cell phone in his possession typically uses that cell phone to conduct trades." When asked whether he had any information prior to the issuance of the search warrant that the particular cell phone he sought to search was used in arranging the purchase or sale of drugs, Welch replied, "No. I was not on the scene."

Glispie was convicted on all counts. The trial court denied his motion for new trial, and this appeal followed.

1. Glispie contends that the trial court erred by denying his motion in limine[8] to exclude evidence of text messages extracted from one of the cell phones found on him at the scene and by admitting the evidence over his objections. This enumeration presents no basis for reversal.

(a) *Search warrant*. Glispie argues that the search warrant application for the cell phone failed to provide probable cause sufficient to justify the issuance of the warrant. We disagree.

"A defendant aggrieved by an unlawful search and seizure may move the court . . . to suppress as evidence anything so obtained on the grounds that . . . [t]he search and seizure with a warrant was illegal because . . . there was not probable cause for

---

[8] See *State v. Johnston*, 249 Ga. 413, 415 (3) (291 SE2d 543) (1982) ("A motion in limine is a pretrial motion which may be used two ways: 1) The movant seeks, not a final ruling on the admissibility of evidence, but only to prevent the mention by anyone, during the trial, of a certain item of evidence or area of inquiry until its admissibility can be determined during the course of the trial outside the presence of the jury. 2) The movant seeks a ruling on the admissibility of evidence prior to the trial. The trial court has an absolute right to refuse to decide the admissibility of evidence, allegedly violative of some ordinary rule of evidence, prior to trial. If, however, the trial court decides to rule on the admissibility of evidence prior to trial, the court's determination of admissibility is similar to a preliminary ruling on evidence at a pretrial conference[,] and it controls the subsequent course of action, unless modified at trial to prevent manifest injustice.") (citations, punctuation, footnote, and emphasis omitted).

the issuance of the warrant. . . ."[9] "[T]he burden of proving the lawfulness of a search warrant is on the State[,] and that burden never shifts."[10]

The magistrate's task in determining if probable cause exists to issue a search warrant is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. Our duty in reviewing the magistrate's decision in this case is to determine if the magistrate had a "substantial basis" for concluding that probable cause existed to issue the search warrants. A magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court.[11]

Further,

doubtful cases should be resolved in favor of upholding the determination that issuance of a warrant was proper, reflecting both a desire to encourage use of the warrant process by police officers and a recognition that once a warrant has been obtained, intrusion upon

---

[9] OCGA § 17-5-30 (a) (2).

[10] *Young v. State*, 282 Ga. 735, 737 (653 SE2d 725) (2007).

[11] (Punctuation omitted.) *State v. Hunter*, 282 Ga. 278 (646 SE2d 465) (2007), quoting *DeYoung v. State*, 268 Ga. 780, 787 (7) (493 SE2d 157) (1997).

interests protected by the Fourth Amendment is less severe than otherwise may be the case.[12]

Here, in the affidavit upon which the search warrant was based, Welch listed his experience and training with narcotic sales and stated that one of the cell phones found on Glispie had been "recovered as evidence related to a violation of Georgia's controlled substance act."[13] Welch averred that he had reason to believe that the cell phone contained certain items, namely "[text messages, phone numbers in call history, digital phone book, digital pictures, digital video, voice[ ]mails, times of phone calls and text messages, which are being possessed in violation of OCGA § 16-13-30 (b)[:] Possession of cocaine with intent to distribute." After detailing the events leading up to Glispie's arrest, including the attempted traffic stop, Glispie's flight, the officers' interactions with the owner of the vehicle, and Glispie's striking one of the officers during his attempt to escape, the affidavit listed the items found on Glispie's person after a pat-down of his pockets, including the drugs, two cell phones, and cash.

_____

[12] (Punctuation omitted.) *Smith v. State*, 296 Ga. 731, 734 (2) (a) (770 SE2d 610) (2015), quoting *Glenn v. State*, 288 Ga. 462, 466 (2) (d) (704 SE2d 794) (2011).

[13] The affidavit listed the crimes Glispie had been charged with, including two counts of possession of a controlled substance with the intent to distribute.

10

The affidavit "provided the issuing magistrate with sufficient information to make a practical, common sense decision that there was a fair probability that evidence of the crime would be found on the items to be searched."[14] As noted by our Supreme Court, "the test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life on which reasonable and prudent men act."[15] Given the nature of the items in Glispie's possession at the time of his arrest, including a large number of suspected drugs, cash, a residue-laden razor, and *two* cell phones, the magistrate was authorized to conclude "based on . . . practical considerations of everyday life" that there was a fair probability that the phone he also possessed would contain evidence of drug sales.[16] Considering the specific evidence in this case and giving the

---

[14] *Smith*, 296 Ga. at 734 (2) (a).

[15] (Punctuation omitted.) Id., quoting *Hunter*, 282 Ga. at 278.

[16] See *Smith*, 296 Ga. at 734-735 (2) (a) (holding that a magistrate judge had a substantial basis upon which to conclude that there was sufficient probable cause to support a search warrant authorizing the search of the cell phone of the defendant charged with murder, as well as the cell phones of four other individuals involved in the incident); *Richbow v. State*, 293 Ga. App. 556, 559 (667 SE2d 418) (2008) ("Multiple cell phones along with other elements may be sufficient" "to create a reasonable suspicion of criminal activity.") See also *Johnson v. State*, 2015 Ark. 387 (2015) (upholding a search of defendant's cell phone pursuant to a search warrant because it "it is reasonable to infer that the cell phone that was in his possession was

11

magistrate the requisite substantial deference, we conclude that the trial court did not

err by denying Glispie's motion in limine to exclude the text messages taken from the

cell phone found on him at time of his arrest, notwithstanding that police had no

specific knowledge of Glispie's use of the phone.

(b) *Objections*. Glispie contends that the trial court erred by admitting the text

messages taken from his cell phone over various objections he made at trial.[17] "On

appeal, the admission of evidence is reviewed for an abuse of discretion."[18] "A proper

application of the abuse-of-discretion review recognizes the range of possible

conclusions the trial judge may reach, and that there will often be occasions in which

---

used to communicate with others regarding the shootings before, during, or after they occurred"). Compare *Brown v. State*, 330 Ga. App. 488, 494 (2) (767 SE2d 299) (2014) (reversing the denial of the defendant's motion to suppress images of child pornography found on defendant's cell phone because the defendant was suspected only of driving under the influence ("DUI") and the affidavit filed in support of the search warrant contained no information whatsoever suggesting that the cell phone contained evidence of the DUI or any other crime).

[17] This case was tried on October 21, 2013. Thus, Georgia's new Evidence Code, which applies to any motion made or trial commenced after January 1, 2013, applies to this case. See Ga. L. 2011, pp. 99, 214 §101.

[18] See *Burgess v. State*, 292 Ga. 821, 823 (4) (742 SE2d 464) ( 2013)

we will affirm the evidentiary ruling of a trial court even though we would have gone the other way had it been our call."[19]

(i) First, Glispie contends that the data taken from his cell phone was not properly authenticated. We disagree.

Pursuant to OCGA § 24-9-901 (a), "[t]he requirement of authentication or identification as a condition precedent to admissibility shall be satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

> There are no special rules under Georgia law governing the authentication of electronic documents or communications. Electronic records and e-mails are to be treated the same as ordinary writings for purposes of authentication and admission. As with all authentication issues, the trial court should admit the evidence if a reasonable jury could find that the evidence is what it is claimed to be. Every form of electronic communication can be "spoofed," "hacked," or "forged." But this does not and can not mean that courts should reject any and all such communications. Indeed, the vast majority of these communications are just as they appear to be – quite authentic. The goal is to supply

---

[19] (Punctuation omitted.) *Williams v. State*, 328 Ga. App. 876, 880 (1) (763 SE2d 261) (2014), quoting *United States v. Frazier*, 387 F.3d 1244, 1259 (II) (11th Cir. 2004).

13

sufficient, nonhearsay evidence as to the identity of the source such that a reasonable factfinder could conclude that the evidence is what it is claimed to be.[20]

As the Eleventh Circuit has held,

[t]o authenticate a document, Rule 901 only requires a proponent to present sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be. After meeting the prima facie burden, the evidence may be admitted, and the ultimate question of authenticity is then decided by the jury. . . . Evidence may be authenticated through the testimony of a witness with knowledge.[21]

Here, Welch testified that he observed another officer recover and download the text messages taken from the cell phone found on Glispie, which messages were then printed out. According to Welch's testimony, Glispie refers to himself in the text messages by his first name at least twice. This evidence establishes a prima case that "the evidence was what it purported to be – text messages between [Glispie and other

---

[20] (Punctuation omitted.) *Koules v. SP5 Atlantic Retail Ventures, LLC*, 330 Ga. App. 282, 287, n. 7 (767 SE2d 40) (2014), quoting Paul S. Milich, *Ga. Rules of Evidence*, § 7:6 (2014-2015 ed.). See also *Moore v. State*, 295 Ga. 709, 713 (3) (763 SE2d 670) (2014) ("'Documents from electronic sources . . . are subject to the same rules of authentication as other more traditional documentary evidence and may be authenticated through circumstantial evidence.'").

[21] (Citation and punctuation omitted.) *United States v. Lebowitz*, 676 F.3d 1000, 1009 (III) (11th Cir. 2012).

individuals]."[22] And although Welch testified that the cell phone was actually registered to another individual who had access to and had been using the cell phone, the State presented sufficient evidence to support a finding that the text messages were to and from Glispie. Accordingly, the trial court did not abuse its discretion by overruling Glispie's authentication objection.

(ii) Next, Glispie argues that the text messages recovered from the phone should have been excluded as inadmissible hearsay. Again, we find no basis for reversal.

In Georgia, hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth

---

[22] *United States v. Sterlin*, 466 Fed. Appx. 792, 797 (III) (B) (11 Cir. 2012). See also *Burgess*, 292 Ga. at 823 (4) (holding that a printout from a screen shot of the defendant's profile page from a social media website was properly authenticated by the officer who printed the document and testified that the defendant used the nickname displayed on the profile page and that the page contained photographs of the defendant); *United States v. Carr*, 607 Fed. Appx. 869, 876 (III) (A) (11th Cir. 2015) (text messages sent by defendant were properly authenticated by the records custodian from the cell phone service provider); *United States v. Mebrtatu*, 543 Fed.Appx. 137, 140-141 (II) (B) (3d Cir. 2013) (holding that text messages taken from the defendant's cell phone were properly authenticated based on the arresting officer's testimony that the phone was found on the defendant's person and based on evidence that some of the text message exchanges referred to the defendant and her boyfriend by name).

of the matter asserted."[23] Pretermitting whether the text messages constituted hearsay, they were admissible as an admission by a party-opponent.

OCGA § 24-801 (2) (A) provides that "[a]dmissions shall not be excluded by the hearsay rule. An admission is a statement offered against a party which is . . . [t]he party's own statement." "[A] defendant's incriminating statement is admissible when it constitutes an admission against the defendant's penal interest because a *defendant's* declaration against penal interest is the admission of a party-opponent."[24]

Here, as we concluded in Division 1 (b) (i), the trial court did not abuse its discretion by concluding that the text message evidence was authenticated. And because the messages implicated Glispie and constituted statements against penal interest, they were admissible as party admissions.[25]

---

[23] OCGA § 24-8-801 (c).

[24] (Punctuation omitted; emphasis in original.) *Bryant v. State*, 288 Ga. 876, 888 (9) (a) (708 SE2d 362) (2011), quoting *Teal v. State*, 282 Ga. 319, 327 (3) (647 SE2d 15) (2007).

[25] See *United States v. Siddiqui*, 235 F.3d 1318, 1323 (II) (B) (11th Cir. 2000) (affirming admission of emails sent by the defendant as admissions of a party pursuant to Fed. R. Evid. 801 (d) (2) (A)); *United States v. Moore*, 611 Fed. Appx. 572, 577 (I) (C) (1) (11th Cir. 2015) ("any out-of-court statements made by [the defendant] himself in the intercepted phone calls and text messages constitute prior party admissions").

16

2. Glispie contends that the trial court erred by denying his motion for mistrial after a witness gave inadmissible testimony in response to a question propounded by Glispie's trial counsel on cross-examination. We disagree.

During the cross-examination of Deputy Thompson, defense counsel asked Thompson a series of questions regarding Glispie's connection to the vehicle parked in the driveway, which vehicle was involved in the traffic infractions reported by Deputy Watts. Defense counsel then asked Thompson: "Did you find any of [Glispie's] personal effects or anything, any identifying documents or anything of that nature involving Mr. Glispie inside the vehicle?" Thompson responded, "No, sir. [The man wearing the white t-shirt and flannel plaid-looking pajama pants] had said he had loaned [Glispie] the car[,] and I took him at his word."

Defense counsel objected and asked the court to consider a matter outside the presence of the jury. The trial court excused the jury, and defense counsel moved for a mistrial on the basis that Thompson's testimony was non-responsive to the question asked and was inadmissible hearsay because the man who had worn the white t-shirt and pajama pants was not in court to testify. The trial court denied the motion, ruling that defense counsel had opened the door: "You asked a series of questions leading up to the question all around what evidence there was to link Mr. Glispie to the car,"

17

and with "at least the two [questions] before the last one, it's not unexpected that this would happen."

> Whether to grant a mistrial is a matter within the discretion of the trial court, and that discretion will not be interfered with on appeal unless it is apparent that a mistrial is essential to the preservation of the right to a fair trial. Although one may legitimately complain about illegal testimony which is not responsive to the question, one cannot take chances in propounding questions which may elicit damaging answers, otherwise inadmissible, and then demand a mistrial when such answer is given.[26]

Here, defense counsel took chances by asking the officer a series of questions regarding Glispie's connection to the vehicle involved in the earlier traffic infractions notwithstanding the fact that, as the trial court pointed out, defense counsel "knew that this conversation occurred from the discovery." When the jury returned to the courtroom, the trial court gave the jury a curative instruction to disregard the answer Thompson had given just prior to the jury being excused. "Th[e] witness's objectionable statement was not solicited by the prosecutor, and, considering the

---

[26] (Punctuation and footnotes omitted.) *Gorman v. State*, 318 Ga. App. 535, 539-540 (3) (734 SE2d 263) (2012).

18

curative instructions given, the decision to deny the motion for mistrial was not an abuse of discretion and did not violate [Glispie's] right to a fair trial."[27]

3. Glispie contends that the trial court erred by denying his pretrial motion to suppress the drugs police recovered after they searched him. But when defense counsel stated at trial that he had no objection to the admission of the drugs, Glispie "waived and failed to preserve his right to contest the admission of the evidence on appeal on the grounds raised in the motion to suppress,"[28] or "any objection which might have been urged."[29]

4. Glispie contends that the evidence was insufficient to support his convictions. We disagree.

"On appeal, [Glispie] no longer enjoys a presumption of innocence, and we view the evidence in the light most favorable to support the verdict. Our review is

---

[27] *Grissom v. State*, 296 Ga. 406, 414 (6) (768 SE2d 494) (2015). See generally *Gorman*, 318 Ga. App. at 539-540.

[28] (Footnote omitted.) *Lightsey v. State*, 316 Ga. App. 573 (730 SE2d 67) (2012).

[29] (Footnote omitted.) Id. at 574.

limited to determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[30]

(a) *Violation of the Georgia Controlled Substances Act (2 counts)*. Given the items found in Glispie's pockets, including large amounts of cocaine and 3, 4-methylenedioxymethcathinone (methylone), cash, two cell phones, and a residue-laden razor blade, coupled with the evidence regarding the text messages between Glispie and other individuals, we conclude that the evidence was sufficient to support Glispie's convictions for possession with intent to distribute cocaine and possession with intent to distribute 3, 4-methylenedioxymethcathinone (methylone).[31]

(b) *Obstruction of a law enforcement officer*. Glispie was charged with willfully obstructing, resisting, and opposing Deputy Thompson by kicking him. Glispie contends that the evidence was insufficient to support that conviction because it showed that he "ultimately failed to kick [Thompson]." This assertion is belied by the record. Thompson testified that Glispie's "heel grazed from [Thompson's] knee cap all the way down the side of [his] leg to [his] ankle," leaving a red mark and

---

[30] (Citations omitted.) *Anderson v. State*, 238 Ga. App. 866 (1) (519 SE2d 463) (1999).

[31] See OCGA § 16-13-30 (b).

causing his leg to sting. This evidence was sufficient for a rational trier of fact to find that Glispie kicked Thompson.[32]

(c) *Fleeing and attempting to elude*. Glispie was charged with fleeing and attempting to elude by willfully failing and refusing to bring his vehicle to a stop after having been given a visual and an audible signal by a police officer. Glispie contends that the evidence was insufficient to support his conviction for this charge because the State failed to prove identity. Again, we disagree.

Watts did not observe any of the driver's facial features, and Glispie argues that Watts's identification of him as the driver of the vehicle based merely "upon an apparent similarity of clothing and race to that of the perpetrator" was insufficient to establish his identity. Glispie also points out that the vehicle involved in the chase was not registered to him, police did not recover any car keys on his person when they searched him, and police did not recover any of his personal effects in the vehicle.

"Identity is a question for the tri[e]r of fact, and where a witness identifies a defendant (whether the identification be based on the defendant's eyes, clothes, hairline or some intangible factor not capable of description), the credibility of the

---

[32] See OCGA § 16-10-24 (a).

witness making such identification is not to be decided by this [C]ourt."[33] Accordingly, Glispie's contention that Watts's testimony was insufficient to establish his identity is without merit, and we conclude that the evidence was sufficient to support his conviction for fleeing and attempting to elude.[34]

(d) *Failure to stop at a stop sign*. Glispie contends that the evidence was insufficient to support his conviction for failing to stop at a stop sign because the State failed to prove venue. We agree.

> Our Georgia Constitution requires that venue in all criminal cases must be laid in the county in which the crime was allegedly committed. Venue is a jurisdictional fact, and is an essential element in proving that one is guilty of the crime charged. Like every other material allegation in the indictment, venue must be proved by the prosecution beyond a reasonable doubt. Proof of venue is a part of the State's case, and the State's failure to prove venue beyond a reasonable doubt renders the verdict contrary to law, without a sufficient evidentiary basis, and warrants reversal.[35]

---

[33] (Citations and punctuation omitted.) *Wimberly v. State*, 233 Ga. 386, 387 (3) (211 SE2d 281) (1974).

[34] See id; OCGA § 40-6-395 (a).

[35] (Punctuation and footnotes omitted.) *Jones v. State*, 272 Ga. 900, 901-902 (2) (2000).

22

"If in any case it cannot be determined in what county a crime was committed, it shall be considered to have been committed in any county in which the evidence shows beyond a reasonable doubt that it might have been committed."[36]

No witness testified that the intersection of Avalon Boulevard and Ellington Road, where Glispie allegedly drove past a stop sign without stopping, was located in Rockdale County. Accordingly, his conviction for failure to stop at a stop sign must be reversed.[37]

(e) *Driving an unsafe and improperly equipped vehicle*. Glispie was charged with driving an unsafe vehicle based on the fact that the passenger side headlight of the vehicle he was driving was not functioning. Glispie contends that venue in Rockdale County was not proved as to this offense. We disagree.

The evidence showed that Watts observed the vehicle with one of its headlights not working at the intersection of Flat Shoals Road and Salem Road. Watts followed the vehicle, activating his cruiser's emergency lights, and the vehicle came to a stop

---

[36] OCGA § 17-2-2 (h). See *Short v. State*, 276 Ga. App. 340, 342 (1) (a) (623 SE2d 195) (2005); OCGA § 17-2-2 (e).

[37] See *Bell v. State*, 291 Ga. App. 169, 171 (2) (661 SE2d 207) (2008) (reversing conviction where evidence showed that a particular crime occurred at a specified location but there was no evidence that the location was the county of conviction as alleged in the indictment).

on Avalon Boulevard (off Flat Shoals Road), which area Watts testified was in Rockdale County.[38] But there was no testimony that after reaching Avalon Boulevard, Watts had the opportunity to observe the defective headlight that had initially prompted him to stop the vehicle; the evidence showed that the vehicle was driven away before Watts could make contact with the driver.

Nevertheless, "the State may establish the essential element of venue by means of direct and circumstantial evidence."[39] The jury was authorized to infer from the evidence that from the brief period of time that elapsed when Watts observed the vehicle without a working headlight at the intersection of Flat Shoals Road and Salem Road to the time the vehicle came to a stop at the intersection of Flat Shoals Road and

---

[38] See *Alexis v. State*, 313 Ga. App. 283, 285 (1) (721 SE2d 205) (2011) ("[w]hile 'area' near an 'intersection' is somewhat vague, the jury was nevertheless authorized to conclude that the officer was using the terms in a broad enough sense to encompass the location of the crime, based upon his familiarity with the area") (citations and punctuation omitted).

[39] *Bell*, 291 Ga. App. at 171 (2).

Avalon Boulevard, in Rockdale County, the headlight was still not working.[40] Thus, we conclude that the evidence supported Glispie's conviction on this count.[41]

*Judgment affirmed in part and reversed in part. Boggs, J., concurs. Phipps, P. J., concurs in judgment only.*

---

[40] See id. (venue was proved where circumstantial proof was sufficient to eliminate every reasonable hypothesis save that crime was committed in county as alleged in indictment).

[41] See id; OCGA § 40-8-71 (a).