S16G0583. GLISPIE v. THE STATE.
(793 SE2d 381)

MELTON, Justice.

In *Glispie v. State*, 335 Ga. App. 177 (779 SE2d 767) (2015), the Court of Appeals affirmed Jaylend Glispie's convictions for violation of the Georgia Controlled Substances Act and certain driving offenses. We granted certiorari to consider the following two questions: (1) Did the Court of Appeals err in concluding that text messages sent to the cell phone found in Glispie's possession were admissible as party admissions? (2) Did the Court of Appeals err in concluding that the trial court did not err in denying Glispie's motion in limine to exclude the text messages?

As found by the Court of Appeals, the record in this case shows the following:

[O]n February 7, 2013, at about 2:00 a.m., Nathan Watts, a Rockdale County sheriff's deputy, was on patrol in a marked patrol cruiser on Flat Shoals Road when he observed a vehicle without a working headlight in the left turning lane of Salem Road. As Watts continued to travel on Flat Shoals Road, he crossed Salem Road and peered into the vehicle. Watts did not observe any of the driver's facial features, but he did observe that the driver, the sole occupant of the vehicle, was a black male wearing a "bright red[-]like sweater shirt." Watts turned his patrol cruiser around and followed the vehicle, which had turned onto Flat Shoals Road in the opposite direction in which Watts had been traveling.

Watts got behind the vehicle and activated his cruiser's emergency lights and siren to initiate a stop of the vehicle, which then turned onto a side street and stopped. Watts testified that he "aired [his] situation over the radio," reporting his location and giving "a short description of the vehicle," including the tag number and color and body type of the vehicle. Watts then exited his patrol cruiser. As Watts "started moving [toward the vehicle], the vehicle started moving too," and was driven away "in a hurry" before Watts could make

contact with the driver. Watts returned to his cruiser, pursued the vehicle, and announced his pursuit over the radio, giving a description of the vehicle and the direction in which it was being driven. When the vehicle proceeded through an intersection without stopping at the stop sign, Watts stopped his cruiser, deactivated its emergency lights, and in the interest of safety, ended his pursuit.

On his computer, Watts obtained the address associated with the driver's license of the registered owner of the vehicle. The address was in Rockdale County, not far from Watts's location, and Watts drove to the residence; approximately seven minutes passed from the time he stopped pursuing the vehicle to the time he arrived at the residence. Deputy Curtis Thompson, who had heard Watts's broadcast, arrived at the residence before Watts. Thompson exited his cruiser and started walking toward the home. The vehicle that Watts had pursued was parked in the driveway, and two black men were in front of the residence. One man wore a white t-shirt and flannel plaid-looking pajama pants. The other man, who wore jeans and a red and black shirt, ducked into some bushes as Thompson's cruiser approached. Thompson testified that as he walked past the vehicle, he could "smell the brakes still burning on the car from it having been in the chase, applying the brakes."

Thompson ordered both men to approach him. The man wearing the white t-shirt complied, but the man wearing the red and black shirt, later identified as [Jaylend] Glispie, did not. It appeared that Glispie was "about to run," but Watts approached from behind Thompson at "a different angle in case something happened," and Thompson was able to handcuff Glispie. As Thompson "reached up to start to pat him down[,] . . . [Glispie] tried to take off." Thompson testified that Glispie "stood on his left foot. Picked his right leg up and tried to kick my knee cap out." Thompson stepped to the side, and Glispie's "heel grazed from [Thompson's] knee cap all the way down the side of [Thompson's] leg to [Thompson's] ankle," leaving a red mark. Glispie then "went hopping across the yard with [Thompson] hanging on to the handcuffs." Thompson pulled the handcuffs, "[l]eg swept" Glispie, knocking his feet out from underneath him, and sat down on top of Glispie. Watts positively identified the shirt that Glispie wore in the photograph as the shirt he had seen the driver of the pursued vehicle wearing.

Thompson searched Glispie's pockets. Located therein was one plastic bag containing fourteen rocks of suspected crack cocaine; another plastic bag contained five clear capsules, each filled with a white powder; a "couple of lighters"; two cell phones; some cash; and a razor or box cutter. The rocks had a total net weight of 2.07 grams and later tested positive for cocaine. The capsules had a total weight of less than one gram and later tested positive for 3, 4-methylene-dioxymethcathinone, commonly known as methylone or "Molly."

At trial, Thompson opined that the amount of drugs recovered and the manner in which the drugs were packaged were consistent with an intent to sell or distribute, rather than for personal use. A third law enforcement officer, Sergeant Jason Welch, testified that text messages were extracted from one of the cell phones found on Glispie's person, and the texts indicated that Glispie used the cell phone to sell drugs. Welch testified that part of one text message appearing on January 25, 2013, read, "Kristy, this Jaylend." A text message sent from the phone on February 1, 2013, read, "what is good, babe. This is the dude. I got your number. Everybody calls me Sane or Insane but my real name is Jaylend." Welch was asked whether there were conversations he had seen (in the text messages) which were "particularized toward the distribution or sale of either Mollies or cocaine," and he testified as follows.

A: Absolutely. Molly is mentioned numerous times within these pages. I just flip through at random.
Q: Can you give an example of one of those times?
A: Yes. For instance, you mentioned cocaine. Just flip through a random page. I see this right here. I got some concrete you might like. Hit me when you are ready. That's text number 2433 on January 26th, 2013, at 21:30. That text message was sent to this phone. Basically, someone trying to order up and another one on text message 2479. This was sent to the phone on January 27th, 2013, at 23:59 hours. It states you say a G. which is slang for a gram was 80. And then again from the same number, I need a G. of Molly. What's the move. Basically, I need a gram of Molly and what are you going to do for me.
Q: Are there any other ones that you found that kind of caught your attention primarily?

A: This individual time, they are talking about a dime. Another one from — now the cell phone data that we use to pull this information, we pull contacts too. Some of the numbers are just numbers, random customers ordering up to the phone but other people are listed as contacts. This was sent from an individual they have as Little Rod. It's 2599 sent to the phone and it plainly reads, you got Mollies? Asking if the individual has Mollies.

Welch also testified as to other text messages "about the drug trade." On cross-examination, Welch testified that based on his knowledge, training, and experience, "[a]nyone in possession of narcotics, especially in a manner of intent to sell and has a cell phone in his possession typically uses that cell phone to conduct trades." When asked whether he had any information prior to the issuance of the search warrant that the particular cell phone he sought to search was used in arranging the purchase or sale of drugs, Welch replied, "No. I was not on the scene."

Glispie was convicted on all counts.

(Footnotes omitted.) Id. at 178-181. Based on these facts, the Court of Appeals affirmed Glispie's convictions.

1. Both below and on appeal, Glispie has contended that all of the text messages from his cell phone constitute inadmissible hearsay. In its opinion, the Court of Appeals held that "[p]retermitting whether the text messages constituted hearsay, they were admissible as an admission by a party-opponent." *Glispie*, supra at 185 (1) (b) (ii). This holding is only half accurate. OCGA § 24-8-801 (d) (2) (A) provides that "[a]dmissions shall not be excluded by the hearsay rule. An admission is a statement offered against a party which is . . . *[t]he party's own statement*." (Emphasis supplied.) Therefore, the outgoing text messages on the cell phone may be considered Glispie's own statements, as the facts of this case indicate that Glispie sent the messages. The incoming text messages, however, are not statements by Glispie. As such, they do not fall under this hearsay exception.

Assuming that the incoming messages were, in fact, hearsay, any error in their admission was ultimately harmless in light of the other evidence against Glispie. "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (Citation and punctuation omitted.) *Peoples v. State*, 295 Ga. 44, 55 (4) (c) (757 SE2d 646) (2014). Here, Glispie had an assortment of drugs and drug paraphernalia in his pocket at the

time that he was arrested. Officers familiar with the drug trade testified that the amount of crack cocaine, the drugs' packaging, possession of more than one cell phone, possession of cash in small denominations, and absence of a device to ingest crack with were all consistent with an intent to sell or distribute, without reference to any text messages. Furthermore, admissible outgoing messages from Glispie's phone indicated that he had "real good sh-t" to sell, and one outgoing message simply stated "Molly???????" Given the strongly incriminating and cumulative nature of this admissible evidence, it is highly probable that the admission of the incoming text messages, even if considered to be hearsay, did not contribute to the verdict. See *Peoples*, supra, 295 Ga. at 55 (4) (c); *Felder v. State*, 270 Ga. 641 (8) (514 SE2d 416) (1999).

2. Glispie next contends that the Court of Appeals erred in affirming the trial court's denial of his motion in limine to exclude the text messages because the search warrant application for his cell phone failed to provide probable cause sufficient to justify issuing the warrant. See OCGA § 17-5-30 (a) (2). More specifically, Glispie argues the warrant application failed to show whether Glispie or anyone else had used the cell phones, whether drug-related communications ever occurred, or whether any such communications would be on the cell phones, and, thus, there was not probable cause to issue the warrant. The Court of Appeals held that the trial court did not so err after "[c]onsidering the specific evidence . . . and giving the magistrate the requisite substantial deference . . . notwithstanding that police had no specific knowledge of Glispie's use of the phone." *Glispie*, supra at 183 (1) (a). We agree with the Court of Appeals.

In determining whether probable cause exists to issue a warrant, a magistrate makes a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (Citations and punctuation omitted.) *State v. Palmer*, 285 Ga. 75, 77 (673 SE2d 237) (2009); see also OCGA § 17-5-21 (a). On appeal, we must assess whether the magistrate had a " 'substantial basis' for concluding that probable cause existed to issue the search warrant" by "review[ing] the search warrant to determine the existence of probable cause using the totality of the circumstances analysis set forth in *Illinois v. Gates*, 462 U. S. 213 (103 SCt 2317, 76 LE2d 527) (1983)." *Palmer*, supra at 78. We must also keep in mind that "[a] magistrate's decision to issue a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court." (Citation and punctuation omitted.) Id.

Here, the magistrate had a substantial basis for concluding that probable cause existed to issue the search warrant for Glispie's cell phone. The warrant application was written by Welch, a Rockdale County police officer with over eight years of experience, whose duties, in part, included investigating narcotics crimes. Welch stated he had reason to believe the cell phone contained information related to a violation of OCGA § 16-13-30 (b) in light of the various circumstances listed in the warrant application, including descriptions of a man matching Glispie's description fleeing after a traffic stop, Glispie's physical resistance to arrest, and Glispie's arrest. More importantly, the warrant application stated that police recovered a large amount of crack cocaine, some capsules containing a white powdery substance, $165 in small cash denominations, two cell phones, and a "razor blade with white powdery residue" from Glispie's possession as part of a lawful search incident to arrest. "[T]he test for probable cause is not a hypertechnical one to be employed by legal technicians, but is based on the factual and practical considerations of everyday life on which reasonable and prudent men act." (Citation and punctuation omitted.) *Smith v. State*, 296 Ga. 731, 734 (2) (a) (770 SE2d 610) (2015). In light of the facts and circumstances detailed in the search warrant application, it was reasonable for the magistrate to infer that the cell phones in Glispie's possession at the time of his arrest were used as communicative devices with third parties for drug deals.[1] Thus, there was a legally sufficient basis for the magistrate to issue a search warrant for the cell phones in Glispie's possession.

*Judgment affirmed in part and reversed in part. All the Justices concur.*

DECIDED NOVEMBER 7, 2016.

*Clifford L. Kurlander*, for appellant.
*Richard R. Read, District Attorney, Roberta A. Earnhardt, Kirk M. Thomas, Assistant District Attorneys*, for appellee.

---

[1] We note that this case is distinguishable from and does not controvert *Riley v. California*, 573 U. S. ___ (134 SCt 2473, 189 LE2d 430) (2014), which suggested that the privacy interests in a cell phone are equal to, or perhaps greater than, that of even the "most exhaustive search of a house." Id. at 2491 (B) (I). *Riley* assessed the reasonableness of a *warrantless* search of a defendant's cell phone, while Glispie's case involved a search of his cell phone predicated on a properly issued search warrant.