**FOURTH DIVISION**
**DILLARD, C. J.,**
**DOYLE, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be**
*physically received* **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**February 19, 2019**

# In the Court of Appeals of Georgia

A18A2132. JOHNSON v. THE STATE.

DILLARD, Chief Judge.

Lillie Johnson appeals her conviction for one count of first-degree cruelty to a child, arguing that the trial court abused its discretion in (1) excluding evidence of child pornography discovered on a State witness's phone; (2) admitting evidence of text messages the State did not properly authenticate; and (3) failing to strike a prospective juror for cause. For the reasons set forth *infra*, we affirm.

Viewed in the light most favorable to the jury's verdict,[1] the evidence shows that on October 7, 2015, Johnson gave birth to twins B. L. and R. L., whose father was her then fiancé, Kenneth Lynch. The twins were born ten weeks early, and they were immediately admitted to the Neonatal Intensive Care Unit ("NICU"), where they

---

[1] *See, e.g.*, *Powell v. State*, 310 Ga. App. 144, 144 (712 SE2d 139) (2011).

remained for 43 days. When the newborns were discharged from the hospital, their pediatrician met with Johnson and Lynch and told them that B. L. would need follow-up appointments to monitor her weight. On December 9, 2015, during one of those subsequent appointments, the pediatrician determined that B. L. weighed 1,829 grams, which caused the doctor "significant concern." According to the pediatrician, although babies are expected to grow at a rate of about 15 to 20 grams per day, B. L. weighed more—*i.e.*, 1,900 grams—when she was discharged from the NICU. Ultimately, the pediatrician diagnosed B. L. with "failure to thrive" and admitted her to the hospital for treatment.

After a three-day hospital stay, B. L. weighed 2,060 grams, which was "an incredible amount of weight gain[,]" and she was permitted to go home. But at her next check-up, B. L. appeared "skinny[,]" and her doctor could find no discernable medical reason for her failure to gain weight. According to Lynch, medical professionals advised him and Johnson to feed B. L. every two hours, but they did not do so. Indeed, instead of feeding B. L., Lynch and Johnson ignored her, even when she was crying, while they smoked marijuana, which they did "everyday."

On December 28, 2015, the night before representatives from the Division of Family and Child Services ("DFACS") scheduled a home visit with Johnson and

Lynch due to B. L.'s continued weight loss, Lynch found R. L. "gasping for air" and called 911. R. L. was then taken to the hospital for treatment and placed on life support. In fact, R. L.'s injuries were so severe that he remained in the hospital for "quite a while." And during R. L.'s hospital stay, medical staff confronted Johnson and Lynch, claiming that R. L. suffered from injuries that could only be attributed to shaken-baby syndrome. Hospital staff then reported R. L.'s injuries to law enforcement, and on December 30, 2015, Johnson and Lynch were arrested.

Subsequently, Johnson and Lynch were jointly indicted for three counts of first-degree cruelty to a child and one count of second-degree cruelty to a child. But prior to trial, Lynch entered a negotiated guilty plea with the State and pleaded guilty to one count of first-degree cruelty to a child, which charged him with physically injuring R. L. in various ways.[2] The primary condition of the plea deal was that Lynch

---

[2] At trial, Lynch denied injuring R. L., but indicated that he pleaded guilty to the charged offense because he believed there was sufficient evidence that, if he went to trial, a jury might convict him. This type of guilty plea, in which the defendant maintains his or her innocence, is permitted by *North Carolina v. Alford*, 400 U.S. 25 (91 SCt 160, 27 LE2d 162 (1970) and is commonly referred to as an "*Alford* plea." *See Argot v. State*, 261 Ga. App. 569, 571 (2) (583 SE2d 246) (2003) ("Although [*Alford*] does permit a criminal defendant to plead guilty while claiming to be innocent, where the defendant intelligently concludes that it is in his best interest to enter such a plea, the plea is one of guilt and may be accepted only if the court determines there is a factual basis for a determination of guilt. An *Alford* plea is thus a guilty plea and places the defendant in the same position as if there had been a trial

agreed to cooperate with the State and testify against Johnson, which he did. Following trial, the jury found Johnson guilty of one count of first-degree cruelty to a child, but acquitted her of the remaining charges. Specifically, Johnson was found guilty of count four of the indictment, which alleged that she willfully failed to provide necessary sustenance to B. L., thereby jeopardizing the child's health and well being. Johnson filed a motion for a new trial, which the trial court summarily denied.[3] This appeal follows.

1. In her first two claims of error, Johnson challenges the propriety of evidentiary rulings by the trial court. Specifically, she argues that the trial court erred by (1) excluding evidence of child pornography found on Lynch's phone to impeach

---

and conviction by a jury." (citation and punctuation omitted)).

[3] While the record indicates that a hearing was held on Johnson's new-trial motion, the transcript of the hearing, assuming it occurred, is not included in the record. The parties do not reference any evidence presented at the hearing, and our review of the record and parties' briefs suggests to our satisfaction that the transcript is not necessary to resolve this appeal. In any event, to the extent that a review of the missing transcript would impact the outcome of this appeal, we have held that "it is axiomatic that [the appellant] bears the burden of showing error affirmatively by the record, and when that burden is not met, the judgment is assumed to be correct and will be affirmed." *Fluke v. Westerman*, 271 Ga. App. 418, 420 (1) (609 SE2d 744) (2005) (punctuation omitted).

him during cross-examination, and (2) admitting certain text messages that were not properly authenticated. We disagree.

Evidentiary rulings are reviewed under an abuse of discretion standard, which is "different from and not as deferential as the clearly erroneous/any evidence standard of review."[4] Nevertheless, we accept the trial court's factual findings unless they are clearly erroneous.[5] With these guiding principles in mind, we turn now to Johnson's specific claims of error.

(a) Johnson first argues that the trial court erred by excluding evidence of child pornography found on Lynch's phone.

In a pretrial hearing, Johnson's counsel contended that, during discovery, the State found seven images of child pornography on Lynch's cell phone, and he advised the court of his intent to impeach Lynch with the images if he testified at trial. The State responded that it examined the images and determined that they "are not child sexual abuse images that would likely lead to any type of prosecution against [ ] Lynch or anyone else." The State further indicated that, according to a law-

---

[4] *Reeves v. State*, 294 Ga. 673, 676 (2) (755 SE2d 695) (2014); *accord Reed v. State*, 291 Ga. 10, 13 (3) (727 SE2d 112) (2012).

[5] *See, e.g.*, *McCoy v. State*, 332 Ga. App. 626, 628 (774 SE2d 179) (2015).

enforcement officer who specializes in retrieving electronic evidence, the images at issue were "imbedded," which means they were "attached to something else[,]" making it unclear whether they were intentionally downloaded.

The State further asserted that the images were small and of poor resolution when enlarged, which indicates that the images had not been intentionally collected. Additionally, the images were also in the "cache file[,]"[6] which also suggests it is unlikely they were specifically saved by anyone. The State found it significant that an investigator, who works on child-exploitation cases, advised that he would not pursue a warrant to arrest Lynch for a child-exploitation offense because, even

---

[6] The cache (pronounced "cash") of temporary Internet files is used by web browsers "to store webpage content on the computer hard disk for quick viewing" and allows the browser to "download only the content that has changed since [the user] last viewed a webpage, instead of downloading all the content every time that the page is displayed." Microsoft Knowledge Base Article–260897, *How to Delete the Contents of the Temporary Internet Files Folder*, MICROSOFT, https://support.microsoft.com/en-us/help/260897/how-to-delete-the-contents-of-the-temporary-internet-files-folder (last checked Feb. 11, 2019). This specific type of cache should not be confused with a system cache, which allows high-speed access to recently used data within the computer. *See generally* JEAN ANDREWS, GUIDE TO HARDWARE: MANAGING, MAINTAINING, AND TROUBLESHOOTING 693, 702 (4th ed. 2007) (defining "disk cache" as "[a] method whereby recently retrieved data and adjacent data are read into memory in advance, anticipating the next CPU request," and defining "memory cache" as "[a] small amount of faster RAM that stores recently retrieved data, in anticipation of what the CPU will request next, thus speeding up access").

assuming that the images constituted child pornography,[7] the State would not be able to prove that they were attributable to Lynch. Ultimately, the prosecutor concluded by saying that, "short of the . . . [NCMEC] sending [him] a report indicating that these were known victims of child sexual abuse . . . [,]" he could not "imagine indicting a case like [this]."[8]

Instead of responding to the merits of the State's argument or challenging its characterization of the images, Johnson argued that whether or not the State planned to prosecute Lynch "has very little relevance whatsoever in whether or not [the images are] introduced as evidence as far as a bias." Furthermore, Johnson maintained that, under Georgia law, she should be able to cross-examine Lynch on "any potential bias." And as to the specific bias alleged, Johnson contended that Lynch might be motivated to testify as a State's witness to reduce the likelihood of the State

---

[7] According to the State, several of the images "clearly show adults," and there were only one or two images that could "arguably" involve children. The State explained that the pictures in question are of Asian females, and someone from the National Center for Missing and Exploited Children ("NCMEC") informed the prosecutor that it can be more difficult to determine the age of Asians or Pacific Islanders due to their slender build. Johnson did not dispute or object to the State's description of the images.

[8] The images found on Lynch's phone are not included in the record on appeal, and this Court expresses no opinion regarding the State's decision not to indict Lynch for any charges related to his possession of those images.

prosecuting him for some other crime related to the images. But again, Johnson did not—and does not now—dispute the State's characterization of the images, explanation of the type of electronic files involved, or conclusion that the images are insufficient evidence to charge Lynch with a child-pornography offense. At one point, Lynch's attorney interrupted the discussion and informed the court that the prosecutor never suggested to Lynch that he might be charged with a child-pornography related offense.

Following a lengthy colloquy between the trial court and the parties regarding the admissibility of the images, the court first acknowledged that Lynch could be questioned "about the plea offer, the plea deal, what was entailed there, all the circumstances of that and how that has affected him and whether he has any bias or whether he is testifying in order to curry favor with the State regarding that plea deal." But as to the sexually explicit images, the court ruled that Johnson was limited to asking Lynch the following questions:

> You know you had images shown on a phone seized by police that shows young women, who may be underaged, engaged in sexual activity, don't you? You're testifying this way because you are trying to curry favor with the State. He can say yes or no. The State and the public defender [are] stuck with whatever answer he gives [and,] . . . can't tender separate evidence to challenge [it].

8

During her cross-examination of Lynch, Johnson did indeed ask him these questions, and he answered "no" to both of them.

As explained by the Supreme Court of Georgia, "[t]he right of cross-examination integral to the Sixth Amendment right of confrontation [⁹] is not an absolute right that mandates unlimited questioning by the defense."[10] Indeed, the Confrontation Clause guarantees only "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."[11] Furthermore,

> trial courts retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.[12]

---

[9] *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."); Ga. Const. art. 1, § 1, ¶ XIV ( "Every person charged with an offense against the laws of this state . . . shall be confronted with the witnesses testifying against such person.").

[10] *Hinton v. State*, 280 Ga. 811, 819 (7) (631 SE2d 365) (2006) (punctuation omitted); *accord Watkins v. State*, 276 Ga. 578, 582 (3) (581 SE2d 23) (2003).

[11] *Hinton*, 280 Ga. at 819 (7); *accord Watkins*, 276 Ga. at 582 (3).

[12] *Watkins*, 276 Ga. at 582 (3) (punctuation omitted); *accord Manley v. State*, 287 Ga. 338, 340 (2) (698 SE2d 301) (2010).

9

Additionally, OCGA § 24-4-402 provides that "[e]vidence which is not relevant shall not be admissible." Finally, under OCGA § 24-4-403, even "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Turning to Johnson's argument that the trial court erred in limiting her cross-examination of Lynch, she contends that the sole purpose of admitting evidence of the images was to reveal Lynch's bias in favor of testifying for the State in hopes of avoiding being charged with crimes unrelated to the cruelty-to-a-child charges in this case. And Johnson is indeed correct that OCGA § 24-6-608 does not preclude introduction of extrinsic evidence to prove a witness's bias.[13] But here, the trial court *did* permit Johnson's counsel to question Lynch as to whether he was testifying against her in an attempt to "curry favor with the State" immediately after she asked him about the images. More importantly, the evidence she seeks to admit here does

---

[13] *See* OCGA § 24-6-608 ("Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, *other than . . . conduct indicative of the witness's bias toward a party* may not be proved by extrinsic evidence." (emphasis supplied)); *see also* Ronald L. Carlson & Michael Scott Carlson, CARLSON ON EVIDENCE 304 (6th ed. 2018) ("Unlike many other modes of impeachment, attacks on witness bias are constitutionally guaranteed.")

*not* suggest that Lynch was at risk of being charged with any particular crimes in the future that might have motivated him to testify for the State. Indeed, in a somewhat circular argument, Johnson contends that, while it is *irrelevant* whether the State has enough evidence to prosecute Lynch for child-pornography offenses, he is nevertheless motivated to curry favor with the State to avoid such a baseless prosecution. This argument is unavailing because the potential bias alleged by Johnson cannot exist if the State does not have enough evidence to indict Lynch for any crimes related to the images.

Furthermore, as previously noted, Johnson never disputed or objected to the State's description of the images or its assertion that it lacked sufficient evidence to prosecute Lynch for possessing the images. In this regard, the Supreme Court of Georgia has explained, "[a]ttorneys are officers of the court, and their statements in their place, if not objected to, serve the same function as evidence."[14] Additionally, as an officer of the court, "[i]n the absence of an objection, [a prosecutor's] evidentiary proffers to the trial court during a hearing will be treated on appeal as the

---

[14] *Rank v. Rank*, 287 Ga. 147, 149 (2) (695 SE2d 13) (2010) (punctuation omitted); *see State v. Battle*, 344 Ga. App. 565, 570 (2) (812 SE2d 1) (2018) ("Attorneys are officers of the court and a statement to the court in their place is prima facie true and needs no further verification *unless the same is required by the court or the opposite party*." (punctuation omitted)).

equivalent of evidence."[15] In fact, an officer of the court may "make a statement *in his place* which is taken to be prima facie true unless verification of such statement is required by the opposing party at the time the statement is made."[16]

Given the foregoing, we credit, as *prima facie* true, the prosecutor's representation that Lynch faces no future risk of criminal prosecution related to the images at issue, and therefore, any evidence related to the images is irrelevant to show the specific bias Johnson has alleged.[17] Under such circumstances, the trial

---

[15] *Battle*, 344 Ga. App. at 571 (2); *accord Rank*, 287 Ga. 149 (2).

[16] *Sams v. State*, 197 Ga. App. 201, 203 (5) (397 SE2d 751) (1990) (punctuation omitted); *see Anthony v. State*, 298 Ga. 827, 830 (2) (785 SE2d 277) (2016) ("Attorneys are officers of the court and a statement to the court in their place is prima facie true and needs no further verification *unless the same is required by the court or the opposite party*." (punctuation omitted)).

[17] In her brief, Johnson relies heavily upon *Davis v. Alaska*, 415 U.S. 308 (94 SCt 1105, 39 LE2d 347) (1974) and *Hines v. State*, 249 Ga. 257 (290 SE2d 911) (1982) to support her contention that she should have been able to more thoroughly cross-examine Lynch regarding the images. But these cases are easily distinguishable because they address situations in which a State witness could be impeached with *pending* criminal charges or with questions about whether the witness was ever a subject of the criminal investigation underlying the case. *See Davis*, 415 U.S. at 317-18 (2) (holding that the trial court erred in limiting a defendant's cross examination of a witness who might have been considered as a suspect in the criminal investigation underlying the case); *Hines*, 249 Ga. at 259 (2) (interpreting *Davis* to mean that a defendant has a specific constitutional right in a criminal trial "to cross-examine a key state's witness concerning pending criminal charges against the witness"). Relying on *Davis*, the *Hines* court held that such cross-examination was

court was authorized to exclude as irrelevant *any* cross-examination of Lynch related

to the images, and it certainly did not abuse its discretion in merely limiting cross-

examination on the matter.[18]

permissible because a witness facing pending criminal charges "may be shading his testimony in an effort to please the prosecution." *Hines*, 249 Ga. at 259-60 (2). But here, other than Lynch's possible motivation to please the State to obtain the benefits of the plea deal, Johnson has not alleged any motivation on Lynch's part to shade his testimony to curry favor with the State because he faced *no risk* of being charged with a crime related to the images at issue.

[18] *See Pennsylvania v. Ritchie*, 480 U.S. 39, 53 (III) (A) n.9 (107 SCt 989, 94 LE2d 40) (1987) (acknowledging "a trial judge's traditional power to control the scope of cross-examination by prohibiting questions that are prejudicial, *irrelevant*, or otherwise improper" (emphasis supplied)); *Chrysler Grp., LLC v. Walden*, 303 Ga. 358, 365 (II) (A) (812 SE2d 244) (2018) (reiterating our Supreme Court's precedent, holding that irrelevant evidence should be excluded); *Hodo v. State*, 272 Ga. 272, 274-75 (4) (528 SE2d 250) (2000) (holding that the defendant's confrontation rights were not violated when he was allowed to thoroughly cross-examine a witness about potential bias or motivation to testify for the State, but was not permitted to ask the witness "to conjecture about possible punishment" that the witness might face if convicted of criminal conduct he admitted to on the stand); *Mitchell v. State*, 200 Ga. App. 146, 148 (3) (407 SE2d 115) (1991) (holding that the trial court was authorized to exclude as irrelevant cross-examination of a witness regarding potential racial bias against the defendant when his counsel could not identify the specific motivation that the defense sought to prove); *see also* OCGA § 24-4-401 ("[T]he term 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); OCGA § 24-4-402 ("Evidence which is not relevant shall not be admissible.").

13

(b) Johnson also argues that the trial court erred in allowing the State to introduce unreliable and unauthenticated text messages retrieved from her phone.

During opening statements, the State referenced text messages found on Johnson's phone, and she immediately objected, expressing concern that she did not know which texts were involved or whether they would be admissible at trial. Johnson's objection was overruled, and the State continued with its statement. Then, at trial, the State sought to admit into evidence text messages found on Johnson's phone related to, *inter alia*, her drug use while her children were home. To that end, the State called two law-enforcement officers to authenticate the messages as having been sent by Johnson. Following the officers' testimony, Johnson reiterated her earlier objection. Ultimately, after hearing the parties' arguments, the court overruled the objection, but instructed that the State could only present messages that were sent *from* the phone during the applicable time period. The court reasoned that any messages sent *to* the phone were inadmissible because it would be unclear who sent them, but the State "has and can lay a foundation" as to messages sent from the phone.[19]

---

[19] In discussing the text messages in the context of a different objection, the trial court concluded that the State "probably can lay a foundation that this was her phone; it was in her possession; we took it from her; we downloaded messages; these

14

Regarding authentication of evidence, OCGA §§ 24-9-901 (a) and (b) (1) provide:

> The requirement of authentication or identification as a condition precedent to admissibility shall be satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims . . . [and] the following [is an] example[ ] of authentication or identification conforming with the requirements of this Code section: . . . Testimony of a witness with knowledge that a matter is what it is claimed to be.[20]

Recently, the Supreme Court of Georgia reiterated that "[d]ocuments from electronic sources such as the printouts from a website like Facebook *are subject to the same*

---

say they are from [Johnson]; and these are what she said." But the court also found that "any statements purporting to be from someone else, without further foundation, are just rank hearsay and not admissible." And while the parties did not introduce any text messages received by Johnson from a third party, Johnson did introduce, when cross-examining one of the officers, text messages sent from Lynch's phone to hers. Notably, Johnson fails to explain why she believes text messages sent from Lynch's phone were admissible, while text messages sent from her phone were not.

[20] S*ee Hodges v. State*, 302 Ga. 564, 566 (2) (807 SE2d 856) (2017) (explaining that OCGA § 24-9-901 (b) (1) "applies to the authentication of text messages retrieved from cell phone records"). As explained by our Supreme Court, "[m]any provisions of . . . [our] Evidence Code were borrowed from the Federal Rules of Evidence, and when we consider the meaning of these provisions, we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit." *Olds v. State*, 299 Ga. 65, 69 (2) (786 SE2d 633) (2016).

15

*rules of authentication as other more traditional documentary evidence* and may be authenticated through circumstantial evidence."[21] Indeed, as we have acknowledged, "there are no special rules under Georgia law governing the authentication of electronic documents or communications."[22] Finally, once the party seeking to authenticate a document presents a prima *facie case* that the proffered evidence is

[21] *Hawkins v. State*, 304 Ga. 299, 304 (4) (a) (818 SE2d 513) (2018) (emphasis supplied) (punctuation omitted); *accord Cotton v. State*, 297 Ga. 257, 259 (3) (773 SE2d 242) (2015); *Burgess v. State*, 292 Ga. 821, 823 (4) (742 SE2d 464) (2013). As to any cases cited in this opinion that were decided under our old Evidence Code, our Supreme Court has held that "there is nothing in the new Evidence Code that forbids the use of circumstantial evidence to authenticate these types of electronic communications." *Hawkins*, 304 Ga. at 304 (4) (a) n.5; *see* CARLSON, *supra* note 12, p. 656 ("Documents from electronic sources such as printouts from a website . . . are subject to the same rules of authentication as other more traditional documentary evidence and may be authenticated through circumstantial evidence."); Paul S. Milich, *Ga. Rules of Evidence*, § 7:6 (2018) ("Personal websites, such as Facebook, are authenticated in the same way as other documentary evidence, though the court must be alert to the possibility of unauthorized access to or counterfeiting of websites. A website may be authenticated by traditional means such as the direct testimony of the purported author or circumstantial evidence of distinctive characteristics on the site that identify the author." (citations and punctuation omitted)).

[22] *Koules v. SP5 Atl. Retail Ventures, LLC*, 330 Ga. App. 282, 287 (2) n.7 (767 SE2d 40) (2014) (quoting Milich, *supra*, § 7:6); *see United States v. Carr*, 607 F. App'x 869, 876 (III) (A) (11th Cir. 2015) (noting, in a case involving the authentication of text messages, that "[t]he government's burden here was not an onerous one; the proponent need only present enough evidence to make out a prima facie case that the proffered evidence is what it purports to be" (punctuation omitted)).

16

what it purports to be, "the evidence is admitted and the ultimate question of authenticity is decided by the [jury]."[23]

On appeal, Johnson argues that the State failed to properly authenticate the text messages at issue because it must show more than the electronic communications being provided from a particular device, and she suggests that the State was required to authenticate the messages through Lynch's testimony because he was a participant in the conversations. But the State presented ample circumstantial evidence, set forth *infra*, to authenticate the outgoing text messages found on her phone, and our "Evidence Code recognizes a wide variety of means by which a party may authenticate a writing . . . ."[24] Suffice it to say, the State was not limited to authenticating the text messages through Johnson's preferred method.[25]

---

[23] *Fed. Nat'l Mortg. Ass'n BR-027 v. Harris*, 343 Ga. App. 295, 299 (1) (807 SE2d 75) (2017) (punctuation omitted); *accord Smith v. State*, 300 Ga. 538, 541 (1) (b) (796 SE2d 666) (2017).

[24] *Koules*, 330 Ga. App. at 286 (2); *see* OCGA § 24–9–901(b) (listing "[b]y way of illustration only, and not by way of limitation," ten means of authentication or identification conforming with the requirements of the section).

[25] Johnson also suggests that the State could not authenticate the text messages sent from her phone because the phone was associated with other "accounts[,]" including one of Lynch's e-mail accounts. But she never denies that the phone at issue belonged to her. And regardless, she provides no record citations, legal authority, or meaningful legal argument to support her bare assertion that texts

17

Contrary to Johnson's arguments, the State presented ample evidence to authenticate the outgoing text messages found on her phone and to establish that she authored those messages. Indeed, an investigator with the Hall County Sheriff's Office testified that he executed a search warrant at Johnson and Lynch's residence, and he seized both of their cell phones. Thereafter, the investigator submitted the phones into evidence and filled out "a property and evidence sheet" for both phones. Next, a police detective, who has attended 900 hours of "digital training[,]" testified regarding the data extracted from the phones. As to why he thought the phone at issue belonged to Johnson, the detective testified that a picture of Johnson associated with the phone was a "user generated artifact." Furthermore, the detective testified that it was not uncommon for him to find a device owner's picture in the location where Johnson's picture was found. Additionally, several e-mail addresses that included Lynch and Johnson's names were retrieved from the phone. The detective confirmed that the text messages at issue were extracted from the phone he determined to be Johnson's and that the messages presented by the State had not been altered since the

messages sent from *her phone* cannot be authenticated merely because Lynch, her then-boyfriend, had accessed his e-mail account using her phone at some point. *See Gunn v. State*, 342 Ga. App. 615, 623 (3) (804 SE2d 118) (2017) (holding that the defendant abandoned his claims on appeal when he did not support them with meaningful argument or citation of authority).

18

phone was seized. Further, Johnson's phone received text messages sent from Lynch's phone to a contact he saved as "baby gurl" with an asterisk. Finally, it is undisputed that some of the text messages sent from the phone included B. L. and R. L.'s first names.

Given the foregoing, the trial court did not abuse its discretion in admitting the text messages because there was ample circumstantial evidence to establish that the messages at issue were sent by Johnson from her phone. Indeed, Georgia courts have held that electronic evidence was properly authenticated based on similar or, in some cases, even less circumstantial evidence than the law-enforcement testimony and other evidence presented here.[26] We acknowledge, of course, that "[e]very form of

---

[26] *See Hawkins*, ___ Ga. at ___ (4) (a) (holding that threatening Facebook messages sent to a witness were properly authenticated as being sent by the defendant when, *inter alia*, the recipient testified that he recognized a photo of the defendant associated with the user's account, he was familiar with the defendant's Facebook page before he received the messages, and the messages were exchanged during a conversation between the recipient and the defendant); *Pierce v. State*, 302 Ga. 389, 396 (2) (a) (807 SE2d 425) (2017) (holding that text messages sent by the defendant were properly authenticated when an investigating officer testified that photos he took of the phone's screen were a fair and accurate representation of the messages that appeared on the phone to which the messages were sent); *Glispie v. State*, 335 Ga. App. 177, 185 (1) (b) (i) (779 SE2d 767) (2015), *rev'd in part on other grounds*, 300 Ga. 128 (793 SE2d 381) (2016), and *vacated in part on other grounds on remand*, 341 Ga. App. 817 (801 SE2d 910) (2017) (holding that the trial court did not abuse its discretion in admitting text messages when, *inter alia*, a police officer testified that he observed another officer recover and download the messages taken from a cell

electronic communication can be 'spoofed,' 'hacked,' or 'forged[,]' [b]ut this does not and cannot mean that courts should reject any and all such communications."[27] Indeed, the vast majority of these communications are "just as they appear to

phone found on the defendant, which messages he printed out); *Cotton* , 297 Ga. at 259-60 (3) (holding that Facebook messages were properly authenticated as being sent by the defendant when his mother testified that he went by a nickname associated with the account and also used it as an alias on YouTube, and the mother confirmed that she recognized conversations she had with the defendant from accounts that she had used); *Burgess*, 292 Ga. at 823-24 (4) (holding that there was sufficient circumstantial evidence to authenticate a printout from the defendant's MySpace profile page when witnesses testified that he used a nickname associated with the page and a police officer testified that he compared known photographs of the defendant with images depicted on the printout and determined that they were images of the defendant); *see also Johnson v. State*, ___ Ga. App. ___, ___ (2) (a) (821 SE2d 76) (2018) (physical precedent only) (holding that text messages were properly authenticated through the custodian of the phone records who worked for the phone-service provider); *United States v. Lewisbey*, 843 F3d 653, 658 (B) (1) (7th Cir. 2016) (holding that the government presented more than enough evidence to authenticate certain text messages found on the defendant's phone when, as here, the phone was confiscated by police at the time of his arrest and when the "properties" section of the phone indicated that it was his, as did the contacts directory, which included his mother and attorney); *Carr*, 607 F. App'x at 876 (III) (A) (holding that the trial court did not abuse its discretion in admitting text messages when, *inter alia*, the custodian of the company that kept records of the text messages authenticated them as records kept in the ordinary course of business); *United States v. Lanzon*, 639 F.3d 1293, 1301 (11th Cir. 2011) (citing Federal Rule of Evidence 901 (b) (1) and holding that online messages that were transferred to a Microsoft Word document were properly authenticated when a detective, who participated in the online chats, testified that the transcripts were accurate copies of those conversations).

[27] *Pierce*, 302 Ga. at 396 (2) (a) (punctuation omitted) (quoting Milich, *supra*, § 7:6).

be—quite authentic."[28] And here, as evidenced *supra*, the State "suppl[ied] sufficient, nonhearsay evidence as to the identity of the source such that a reasonable factfinder could conclude that the evidence is what it is claimed to be."[29]

2. Lastly, Johnson argues that the trial court erred in denying her motion to strike prospective Juror No. 43 for cause. Again, we disagree.

In Georgia, there is a presumption that "potential jurors are impartial, and the burden of proving partiality lies with the party seeking to have the juror disqualified."[30] Further,

> whether to strike a juror for cause lies within the sound discretion of the trial court, and a trial court is not obligated to strike a juror for cause in every instance in which the potential juror expresses doubts about his or her impartiality or reservations about his or her ability to set aside personal experiences.[31]

---

[28] *Id.*

[29] *Id*.

[30] *Wheeler v. State*, 327 Ga. App. 313, 314 (1) (758 SE2d 840) (2014) (punctuation omitted) *overruled on other grounds by Willis v. State*, ___ Ga. ___, ___ (820 SE2d 640) (2018); *accord Brown v. State*, 295 Ga. 804, 808 (4) (764 SE2d 376) (2014).

[31] *Wheeler*, 327 Ga. App. at 314-15 (1) (punctuation omitted); *see Brown*, 295 Ga. at 808 (4) ("Whether to strike a juror for cause lies within the sound discretion of the trial judge, and the trial court's exercise of that discretion will not be set aside

Here, Johnson challenges the impartiality of Juror No. 43, who repeatedly indicated that she would be more likely to side with law enforcement and child victims due to her (1) profession in the medical field, in which she treats abused children; (2) service as a mandatory reporter; and (3) work with DFACS and law enforcement. But even if Juror No. 43 were impermissibly biased in favor of the State, it is undisputed that she did not ultimately serve on the jury because Johnson used a peremptory strike to exclude her from the jury pool. Nevertheless, we acknowledge that in numerous prior cases, Georgia courts have held that "peremptory strikes are invaluable, [and when] a defendant in a felony trial has to exhaust his peremptory strikes to excuse a juror who should have been excused for cause the error is harmful."[32] But very recently, the Supreme Court of Georgia overruled those cases as to that particular point of law. Specifically, in *Willis v. State*,[33] our Supreme

_____

absent a manifest abuse of discretion[.]" (punctuation omitted)).

[32] *Kirkland v. State*, 274 Ga. 778, 779 (2) (560 SE2d 6) (2002) (punctuation omitted), *overruled by Willis v. State*, ___ Ga. ___, ___ (820 SE2d 640) (2018); *see Willis*,___ Ga. at ___ n.3 (11) (a) (listing cases in which Georgia courts held that when a trial court errs by failing to strike a juror for cause, the error is harmful even if the juror did not ultimately serve on the jury because the defendant used a peremptory strike to exclude the juror).

[33] ___ Ga. ___ (820 SE2d 640) (2018).

22

Court held that "a defendant is *not* presumptively harmed by a trial court's erroneous failure to excuse a prospective juror for cause simply because the defendant subsequently elected to remove that juror through the use of a peremptory strike."[34] Instead, a defendant must show on appeal that "one of the challenged jurors who served on his or her twelve-person jury was unqualified."[35] And here, Johnson has not argued that any of the jurors who ultimately served on the jury at her trial were unqualified. Thus, under *Willis*, even if Johnson could establish that Juror No. 43 were impermissibly biased and unqualified to serve on the jury, she cannot show that she was harmed by the trial court's failure to strike Juror No. 43 for cause.[36]

---

[34] *Id.* at ___ (11) (a) (emphasis supplied).

[35] *Id.* Although it is inapplicable here, it is worth noting that the *Willis* court also advised in a footnote that, even when the challenged juror serves on the jury, any error by the trial court in failing to strike that juror for cause is still harmless if the defendant did not exhaust his or her peremptory strikes. *See id.* at 15 n.4 (11) (a).

[36] *See Willis*, ___ at ___ 15 (11) (b) (holding that any error by the trial court in finding a challenged juror to be qualified was harmless when the defendant used a peremptory strike to remove the juror from the jury pool and the juror did not serve on the jury); *see also Welbon v. State*, ___ Ga ___, ___ at ___ (2) (___ SE2d ___) (2018) (relying on *Willis* and holding that, even if the defendant could show that the trial court erred in failing to strike a prospective juror for cause, any error was harmless because the challenged prospective juror did not ultimately serve on the jury, and the defendant failed to identify any juror who served on the jury was unqualified).

For all these reasons, we affirm Johnson's conviction.

*Judgment affirmed. Doyle, P. J., and Mercier, J., concur.*