307 Ga. 466
FINAL COPY

S19A0992.  NICHOLSON v. THE STATE.
S19A1006.  NICHOLS v. THE STATE.

NAHMIAS, Presiding Justice.

Appellants Marques Nicholson and Ramon Nichols were tried together and convicted of malice murder and other crimes in connection with the gang-related shooting death of Derrick Linkhorn. On appeal, both of the appellants contend that the evidence presented at their trial was insufficient to support their convictions and that the trial court abused its discretion by denying their motions to sever their cases for trial. Nicholson also contends that the trial court erred by admitting certain cell phone records, and Nichols also contends that the court erred by admitting certain social media records. After review of the record and the briefs, we see no error, so we affirm.[1]

---

[1] Linkhorn was killed on March 8, 2012. On June 4, 2015, a DeKalb County grand jury indicted Nicholson, Nichols, Rahsin Narcisse, and Antarious Johnson for malice murder, felony murder (based on aggravated

1. Viewed in the light most favorable to the verdicts, the evidence presented at the joint trial showed the following. Nicholson, Nichols, and Rahsin Narcisse were members of the 92 Inglewood Family "set" of the Bloods criminal street gang. Nichols was the highest ranking gang member of those involved in the

---

assault), two counts of aggravated assault (one with a firearm; one with hands and feet), and two violations of the Georgia Street Gang Terrorism and Prevention Act (one based on participation in malice murder, felony murder, and aggravated assault with a firearm, and the other based on participation in aggravated assault with hands and feet). Nicholson, Nichols, and Narcisse also were indicted for four additional violations of the gang statute (one based on their occupying supervisory positions in the Bloods gang and conspiring to engage in and engaging in criminal gang activity; and the other three for directing Johnson and two other persons to participate in criminal gang activity), and Nichols and Narcisse were indicted for one more violation of the gang statute for causing and encouraging Johnson to become a member of the Bloods gang.

Narcisse and Johnson pled guilty. Nicholson and Nichols were tried together from February 22 to 29, 2016. The jury found them guilty on all counts. The trial court sentenced each appellant to serve life in prison without the possibility of parole for malice murder, 20 consecutive years for aggravated assault with hands and feet, 15 consecutive years for each of two violations of the gang statute, and 10 consecutive years for each of four other violations of the gang statute. Nichols also was sentenced to 10 consecutive years for his remaining violation of the gang statute. The felony murder count was vacated, and the aggravated assault with a firearm count merged into the malice murder conviction.

Each appellant filed a timely motion for new trial that was later amended with new counsel. Nicholson amended his motion a second time with different counsel. After a joint hearing, the trial court denied both motions on January 31, 2019. The appellants filed timely notices of appeal, and their cases were docketed in this Court for the August 2019 term, submitted for decision on the briefs, and consolidated for opinion.

crimes charged. Nicholson and Narcisse ranked just below Nichols. Antarious Johnson, Malcolm Wilson, and Marcus Estes, along with Linkhorn, were members of a lower ranking subgroup of the 92 Inglewood Family; they were in the process of becoming full members of the set. Nicholson and Nichols had been associated with the Bloods since at least 2009, when they were arrested for spraying a fence with Bloods-related graffiti.

As part of the initiation process, the lower ranking members met with higher ranking members, known as "Big Homies," who had the power to make certain decisions in the gang and to direct lower ranking members. Lower ranking members often received directions from the "Big Homies" through phone conversations and text messages. Nichols regularly contacted Wilson, who would relay information to the other lower ranking members.

In early March 2012, Linkhorn's friend Andre Alexander told a number of people that he was associated with 135 Piru, another set of the Bloods. Alexander was not actually associated with 135 Piru, which angered Linkhorn's fellow gang members, who planned

to attack Alexander for "false claiming." When Linkhorn found out that his associates planned to attack Alexander at Alexander's high school, he warned Alexander, who then left the school.

Nicholson, Nichols, Narcisse, and the lower ranking gang members later learned that Linkhorn had warned Alexander about the planned attack, and they viewed the warning as an act of disloyalty to the gang that required discipline. On the evening of March 7, Nichols, using his nickname "Smurf," sent Wilson a series of text messages related to shooting and killing Linkhorn, including "Tell [Linkhorn] to come thr[ough] so I [c]an pop him," and "I want dar[k] fade wit[h] [Linkhorn] bl[oo]d[.]"[2] Several minutes later, "Smurf" sent a message saying, ". . . y[']all fallback on [th]at 135 s**t, we gotta take care of [Linkhorn] first[.]"[3]

Wilson and Estes, who were charged separately, gave proffers to the State describing the subsequent events leading to Linkhorn's

---

[2] At trial, the State's gang expert explained that the term "pop[ping]" is slang for shooting and "fade" means to kill or to shoot someone.

[3] At trial, the State's gang expert explained that the phrase "135 s**t" referred to the "false claiming" situation involving Alexander.

murder; they both later pled guilty and testified at the appellants' trial.[4] According to Wilson, the decision to kill Linkhorn had been discussed throughout the week leading up to the murder, and it was affirmed in a conference call between Nichols, Narcisse, Wilson, and Johnson on the night of March 7. The next morning, Wilson, Johnson, and Estes met up with Nicholson and Narcisse, and the five of them then went looking for Linkhorn. They first looked for Linkhorn at school, then at his home, and then waited in his neighborhood. When they did not find Linkhorn, they went to an apartment complex near the Kensington MARTA station. A police officer later told them to leave the area. They then went to a nearby library to continue waiting for Linkhorn. Throughout the day, Johnson communicated with Linkhorn by phone, telling him to meet with the group at the Kensington MARTA station. The group then returned to the MARTA station; Johnson and Wilson waited for

---

[4] Wilson and Estes gave their proffers orally, and each of their statements was then summarized in writing. They signed their own written summary acknowledging that it was accurate and voluntarily given, and the summaries were introduced into evidence at the appellants' trial.

Linkhorn while Nicholson, Narcisse, and Estes went ahead to the Southern Pines apartment complex across the street. After Linkhorn arrived at the station, Narcisse instructed Johnson and Wilson by text message to bring Linkhorn to an abandoned apartment at the complex where Nicholson, Narcisse, and Estes were waiting. When everyone was inside the apartment, Wilson, Johnson, and Estes were told to fight Linkhorn; they began beating and kicking him as Narcisse stood by with a gun and Nicholson stood beside Narcisse. Narcisse then asked, "Who wants to do it?" before giving the gun to Johnson, who forced Linkhorn onto his knees and then shot him. Wilson and Estes were told to run, and they ran out of the apartment. As they left, Wilson heard another shot. Johnson then came out of the apartment and left the complex with Wilson and Estes.

According to Estes, on the morning of the murder, he, Johnson, and Wilson met up with two "Big Homies," and the five of them searched for Linkhorn, first at Linkhorn's house, then in his neighborhood, and then at an apartment complex near the

Kensington MARTA station where they were stopped and questioned by a police officer. Throughout the day, Johnson communicated with Linkhorn by phone and by text message, trying to coax him into meeting with the group. Before Linkhorn arrived at the Kensington MARTA station, the two "Big Homies" began walking ahead to an apartment complex in the area, and Wilson told Estes to follow them. Estes tried, but he could not catch up with the "Big Homies," so he waited at the front of the apartment complex until Johnson, Wilson, and Linkhorn arrived. The four of them met up with the "Big Homies" outside the abandoned apartment, and they all went inside. One of the "Big Homies" guarded the door while the other stood by with a gun. The armed "Big Homie" questioned Linkhorn and said "green light" before Johnson, Wilson, and Estes began punching and kicking Linkhorn. The "Big Homie" guarding the door then pushed Linkhorn into the middle of the apartment. The armed "Big Homie" then made Linkhorn get on his knees, asked "Who wants to get him?," gave the gun to Johnson, and told Wilson and Estes to leave once Johnson had shot Linkhorn. Johnson then

shot Linkhorn, and Wilson and Estes ran out of the apartment. Wilson and Estes then returned to the MARTA station and waited for Johnson. In separate photo lineups, Estes identified each of the two "Big Homies" who were involved in Linkhorn's murder; those lineups were admitted into evidence at trial, and as discussed in Division 2 below, the jury could determine that the "Big Homie" who guarded the door was Nicholson and the armed "Big Homie" was Narcisse.

Cell phone records confirmed that Johnson coaxed Linkhorn into meeting with the group at the Kensington MARTA station by telling Linkhorn that Nichols had given Johnson the money that Linkhorn needed to bail a friend out of jail. The records also confirmed that Narcisse instructed Johnson by text message to bring Linkhorn to the abandoned apartment. Surveillance video from the Kensington MARTA station showed Linkhorn leaving with Johnson and Wilson around 3:57 p.m., and Johnson and Wilson returning with Estes about half an hour later; when they returned, Wilson was wearing Linkhorn's hat.

The day after the murder, Wilson sent a text message to Nichols saying, "Can't you tell that I'm serious now?" Nichols replied that he would take care of Wilson and guide him through the process of becoming a full-fledged member of the 92 Inglewood Family. Several days later, Wilson sent a text message to Johnson telling him that their status within the gang had increased. The same week, Johnson asked Nichols several questions by text about the meaning of certain Bloods terminology and the gang's rank structure. Nichols answered Johnson's questions and told him that he would become a full member of the 92 Inglewood Family in April.

When Linkhorn's family realized that he was missing, a search party was formed to look for him. At some point, Johnson joined the search party, and Nicholson sent a text message to Wilson asking if he was participating. About a week after the murder, Johnson responded to a social media post by Linkhorn's sister that asked for information about Linkhorn. Based on information that Johnson gave her, Linkhorn's sister drove to the Southern Pines complex to look for Linkhorn. Although she did not find his body, she relayed

9

the information to the police. The police then spoke with Johnson, and he led them to Southern Pines, where they found Linkhorn's body. They also found two cartridge casings on the floor and recovered a red bandana from Linkhorn's body. The police then searched Johnson's home, where they found a red jacket, a red bandana, and a plastic bag filled with cocaine. The police also searched Wilson's home, where they found a red bandana, a red checkered shirt, and a dresser with carvings and graffiti symbolic of the Bloods gang.

The week before the appellants' trial, Estes reviewed his proffer and the identifications that he had made from the photo lineups, and he confirmed that they were accurate. The day before trial, Estes was assaulted in jail. He then testified at trial that most of the information in his proffer was true, but that Johnson and Wilson were the two "Big Homies" to whom he had referred (although they did not qualify as "Big Homies" in the gang hierarchy). Estes claimed that he had identified the individuals in the photo lineups only because he was trying to get a reduced

sentence.

Wilson also was assaulted in jail prior to trial, but he affirmed the truth of his proffer at trial. He testified that Nicholson, Nichols, and Narcisse were all "Big Homies" in the 92 Inglewood Family at the time of Linkhorn's murder. Wilson identified Nicholson in court as a "Big Homie" who assisted in the hunt for Linkhorn and was in the abandoned apartment during Linkhorn's beating and murder, and Nichols in court as the "Big Homie" who ordered Linkhorn's killing.

The medical examiner who performed Linkhorn's autopsy determined that Linkhorn's cause of death was a gunshot wound to his head, in between his eyebrows. There was another gunshot wound to the left side of Linkhorn's jaw; the bullet lodged in his spinal cord. This gunshot also could have killed Linkhorn, and at the least it would have rendered him quadriplegic. A ballistics expert determined that the two bullets removed from Linkhorn's body were fired from the same gun.

The State's gang expert testified that lower ranking gang

11

members could not discipline other members without authority from higher ranking members. He also testified that the appellants, Narcisse, Johnson, Wilson, and Estes regularly communicated using terminology associated with the Bloods, that the color red is associated with the Bloods, and that Bloods members often carry red bandanas and wear red clothing to signify to others that they are members of the gang.

Nicholson and Nichols did not testify. Their theory of defense was that no physical evidence linked them to the murder and that Wilson and Estes had lied in their proffers to get reduced sentences.

2. Nicholson contends that the evidence was legally insufficient to support his convictions because the only evidence directly incriminating him was the uncorroborated testimony of an accomplice, Wilson. Nicholson is correct in asserting that Wilson was an accomplice in the crimes, and in order to sustain a conviction under Georgia law, testimony by an accomplice to a crime must be corroborated by other evidence implicating the defendant. See OCGA § 24-14-8; *Mangram v. State*, 304 Ga. 213, 216 (817 SE2d 682)

(2018). However, "the testimony of one accomplice can be corroborated by the testimony of another accomplice," *Yarn v. State*, 305 Ga. 421, 424 (826 SE2d 1) (2019), and Wilson's testimony was adequately corroborated by Estes's proffer, including Estes's description of Nicholson's involvement in the hunt for Linkhorn before the murder, Estes's statement that Nicholson was in the apartment standing by Narcisse (and guarding the door) during the murder, and Nicholson's text communication with Wilson after the murder. See OCGA § 16-2-20 (defining parties to a crime); *Broxton v. State*, 306 Ga. 127, 136 (829 SE2d 333) (2019) ("Mere presence at the scene of the crime is not sufficient evidence to convict a defendant of being a party thereto; however, the jury may infer a common criminal intent from the defendant's presence, companionship, and conduct with the other perpetrators before, during and after the offense."); *Mangram*, 304 Ga. at 216 ("Corroborating evidence may be slight, and may be entirely circumstantial. . . . Once the State has introduced independent evidence implicating the defendant, it is for the jury to decide

13

whether the accomplice's testimony has been sufficiently corroborated.").

It is true that Estes never identified by name the "Big Homie" who guarded the apartment door as Linkhorn was attacked; the photo lineup used for the identification was admitted into evidence, but does not identify Nicholson's photo by name; and the police officer who compiled the lineup did not testify that the photo is of Nicholson. Nevertheless, Nicholson was in the courtroom, and the jury was shown the lineup photo as well as a photo taken of Nicholson after his 2009 arrest, so the jurors could determine that the lineup photo depicted Nicholson.[5] After being assaulted in jail just before trial, Estes testified that Nicholson was not one of the "Big Homies" to whom he had referred in his proffer, but the jury was authorized to believe and rely on Estes's prior statements and

---

[5] The jury could similarly determine that the unnamed armed "Big Homie" whom Estes identified in the other photo lineup was Narcisse, who was not in the courtroom but was identified to the jury in a video and photos that were admitted into evidence. We do not understand why the State failed to present more clear-cut evidence that the lineup photos were of Nicholson and Narcisse. But we also note that Nicholson does not argue that the lineup photos were not actually of him and Narcisse.

14

photo lineup identification rather than his trial testimony on this point. See *Robbins v. State*, 300 Ga. 387, 391 (793 SE2d 62) (2016) ("'[A] prior inconsistent statement of a witness who takes the stand and is subject to cross-examination is admissible as substantive evidence . . . .'" (citation omitted)). See also *McKenzie v. State*, 271 Ga. 47, 47-48 (518 SE2d 404) (1999) (holding, under the old Evidence Code, that prior statements of accomplices can provide the mutual corroboration necessary to support a conviction).

We also have reviewed the record and conclude as a matter of constitutional due process that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Nicholson guilty beyond a reasonable doubt of all of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Broxton*, 306 Ga. at 136-137. See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

3. For his part, Nichols contends that the evidence was legally insufficient to support his convictions because the only evidence connecting him to the crimes is an obscure text message sent by "Smurf" to Wilson saying ". . . y[']all fallback on [th]at 135 s**t, we gotta take care of [Linkhorn] first[.]" We disagree.

The evidence showed that Nichols was the highest ranking gang member involved in the dealings with Linkhorn, with the power to direct lower ranking gang members. There also was ample evidence that Nichols uses the nickname "Smurf." Wilson testified at trial that Nichols's nickname is "Smurf," and Nichols identified himself as "Smurf" in text messages from a cell phone number linked to him and in private messages from a Facebook account linked to him. See *Mathis v. State*, 291 Ga. 268, 269-270 (728 SE2d 661) (2012) (holding that there was sufficient evidence to sustain the defendant's convictions where, among other things, testimony established that he used a nickname that had been linked to the crimes). And in addition to the text message on which Nichols focuses, on the evening before the murder there were other text

16

messages sent by "Smurf" to Wilson that related to shooting and killing Linkhorn, including "Tell [Linkhorn] to come thr[ough] so I [c]an pop him," and "I want dar[k] fade wit[h] [Linkhorn] bl[oo]d[.]" Wilson also testified that the decision to kill Linkhorn was discussed throughout the week leading up to the murder and was affirmed on a conference call in which Nichols participated on the night before the murder, shortly after sending the text messages. Moreover, after the murder, Wilson bragged to Nichols that he had shown he was serious, and Nichols replied by telling Wilson that he would take care of Wilson and guide Wilson through the process of becoming a full-fledged member of Nichols's gang set. The gang expert's testimony provided explanations to the jury about the gang structure and what the text messages meant, which was supported by the evidence from Wilson about Nichols's orders. See *McGruder v. State*, 303 Ga. 588, 593 (814 SE2d 293) (2018).

A defendant need not pull the trigger, or even be present for a shooting, to be found guilty as a party to murder and related crimes. See OCGA § 16-2-20; *Broxton*, 306 Ga. at 136; *Herrington v. State*,

17

300 Ga. 149, 150 (794 SE2d 145) (2016); *Rai v. State*, 297 Ga. 472, 475-476 (775 SE2d 129) (2015). When viewed properly in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient for the jury to conclude that Nichols intentionally advised, encouraged, counseled, and procured the lower ranking gang members to commit the crimes against Linkhorn. See OCGA § 16-2-20 (b) (4). See also *Cisneros v. State*, 299 Ga. 841, 846-847 (792 SE2d 326) (2016) ("'All of the participants in a plan to [commit a crime] are criminally responsible for the acts of each, committed in the execution of the plan, and which may be said to be a probable consequence of the unlawful design, even though the particular act may not have actually been a part of the plan.'" (citation omitted)). The evidence against Nichols was far from overwhelming, but it was legally sufficient to support his convictions as a party to the murder and as a party to or principal in the other crimes of which he was convicted. See *Jackson*, 443 U. S. at 319.

4. Nicholson and Nichols each contend that the trial court abused its discretion by denying their motions to sever their cases

for trial. We disagree.

> In a murder case where the death penalty is not sought, the trial court has broad discretion to grant or deny a motion for severance. In exercising that discretion, the trial court must consider the following factors: (1) Will the number of defendants create confusion as to the law and evidence applicable to each? (2) Is there a danger that evidence admissible against one defendant will be considered against the other despite the court's instructions? (3) Are the defenses of the defendants antagonistic to each other or to each other's rights?

*Butler v. State*, 290 Ga. 412, 413 (721 SE2d 876) (2012) (citations and punctuation omitted).

In this trial, there were only two defendants, who were facing almost the same charges; the law and the evidence were substantially the same for both of them. See *Butler*, 290 Ga. at 413. The trial court instructed the jury to separately consider Nicholson's and Nichols's guilt, see id., and the jury returned separate verdicts for each defendant, see *Lupoe v. State*, 300 Ga. 233, 242 (794 SE2d 67) (2016). Neither Nicholson nor Nichols points to any evidence admitted at their joint trial that would not have been admitted had his severance motion been granted, because the State's evidence was

19

that they acted in concert with each other and other gang members to commit the crimes. See id.; *Butler*, 290 Ga. at 413-414. Although each appellant argues that the joint trial harmed him because the evidence against him was weaker than the evidence against the other, "'it is not enough for the defendant to show that he would have a better chance of acquittal at a separate trial or that the evidence against a co-defendant is stronger.'" *Butler*, 290 Ga. at 413 (citation omitted). Finally, Nicholson and Nichols did not present antagonistic defenses. Instead, they each argued that the State had not introduced sufficient evidence that he was involved in the murder, without trying to implicate one another. See id. For these reasons, the trial court did not abuse its discretion by denying the motions to sever.

5. Nicholson contends that the trial court abused its discretion by admitting cell phone records that included a number of text messages that the State claimed he had sent. The State used a search warrant to obtain the records from AT&T, which also provided a verification of authenticity. Nicholson argues that the

State did not sufficiently authenticate that the text messages were sent by him. We disagree.

"Under OCGA § 24-9-901 (a), authentication of evidence may be achieved through any of a variety of means affording 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Brewner v. State*, 302 Ga. 6, 16 (804 SE2d 94) (2017) (quoting that statute). "Documents from electronic sources . . . are subject to the same rules of authentication as other more traditional documentary evidence and may be authenticated through circumstantial evidence," *Hawkins v. State*, 304 Ga. 299, 304 (818 SE2d 513) (2018) (citation and punctuation omitted), which may include the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics [of the documents], taken in conjunction with circumstances." OCGA § 24-9-901 (b) (4). See also *Pierce v. State*, 302 Ga. 389, 395-396 (807 SE2d 425) (2017). Once the party seeking to authenticate evidence presents a prima facie case that the evidence is what it purports to be, the evidence is properly admitted, leaving the ultimate question of authenticity to

21

be decided by the jury. See *McCammon v. State*, 306 Ga. 516, 523 (832 SE2d 396) (2019); *Johnson v. State*, 348 Ga. App. 667, 675-677 (824 SE2d 561) (2019).

The gang expert testified that he had reviewed the cell phone records; that the subscriber address on the account matched an address listed for Nicholson on documents related to his 2009 arrest and on his driver's license; that text messages from the cell phone number used Bloods slang and terminology, which likely would not be used or understood by someone who was not associated with the gang; and that the number communicated with the phone numbers of Nichols, Narcisse, Wilson, and Johnson. These communications included a text message from the number to Wilson's phone two days after Linkhorn was killed asking whether Wilson was searching for Linkhorn. This was sufficient evidence to allow a reasonable jury to find that Nicholson sent the text messages in question, so the trial court did not abuse its discretion by admitting the challenged cell phone records. See *Johnson*, 348 Ga. App. at 676-677; *United States*

*v. Mebrtatu*, 543 Fed. Appx. 137, 140-141 (3d Cir. 2013).[6]

6. Nichols contends that the trial court abused its discretion by admitting Facebook records that included several private messages that the State claimed he had sent. The State used a search warrant to obtain the records from Facebook, which also provided a certification of authenticity. Nichols argues that the State did not sufficiently authenticate that the messages were sent by him. Again we disagree.

The prima facie showing required to admit printouts from a Facebook account may be established by circumstantial evidence of distinctive characteristics of the account that identify its owner. See *Hawkins*, 304 Ga. at 304 n.5; *Cotton v. State*, 297 Ga. 257, 259-260 (773 SE2d 242) (2015). At trial, the gang expert testified that he had reviewed the Facebook records; that the account contained Nichols's biographical information including his name, nicknames associated

[6] OCGA § 24-9-901 departs from the former Evidence Code and is nearly identical to Federal Rule of Evidence 901. Thus, we look to the federal appellate courts for guidance in interpreting OCGA § 24-9-901. See *Davis v. State*, 299 Ga. 180, 185 (787 SE2d 221) (2016); *Johnson*, 348 Ga. App. at 675 n.20.

with him, and his birth date; that Wilson's name was listed in the friend's list of the account, and the owner of the account sent a message to Wilson's account wishing Wilson a happy birthday; that the IP address linked to the account was located in Decatur, where Nichols lived; and that in private messages sent from the account, the sender identified himself as "Smurf" and provided a phone number that belonged to Nichols.

This was sufficient evidence to allow a reasonable jury to find that Nichols owned the Facebook account and sent the private messages. See *Cotton*, 297 Ga. at 259-260 (holding that a Facebook account was properly authenticated by a witness who knew the defendant's nickname that was associated with the account and recognized that the defendant's friends and family were listed in the friend's list of the account); *Burgess v. State*, 292 Ga. 821, 823-824 (742 SE2d 464) (2013) (holding that a MySpace account was properly authenticated by an investigator who testified that the defendant's nickname was associated with the account and identified the

24

defendant's biographical information on the account);[7] *Glispie v. State*, 335 Ga. App. 177, 185 (779 SE2d 767) (2015) (holding that text messages were properly authenticated by an investigator who, among other things, testified that the sender referred to himself by name in the messages), reversed in part on other grounds, 300 Ga. 128 (793 SE2d 381) (2016). The trial court did not abuse its discretion by admitting the Facebook records.

*Judgment affirmed. All the Justices concur.*

---

[7] "Although *Burgess* was based on the old Evidence Code, there is nothing in the new Evidence Code that forbids the use of circumstantial evidence to authenticate these types of electronic communications. See OCGA § 24-9-901; Paul S. Milich, Ga. Rules of Evidence, § 7:6 (2014)." *Cotton*, 297 Ga. at 259 n.6.

DECIDED DECEMBER 23, 2019.

Murder. DeKalb Superior Court. Before Judge Adams.

*Michael W. Tarleton*, for appellant (case no. S19A0992).

*Genevieve Holmes*, for appellant (case no. S19A1006).

*Sherry Boston, District Attorney, Emily K. Richardson, Lenny I. Krick, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.