**FOURTH DIVISION**
**DILLARD, P. J.,**
**BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**June 5, 2024**

# In the Court of Appeals of Georgia

A24A0048. BRYAN v. THE STATE.

BROWN, Judge.

Joe Randall Bryan appeals from his conviction of enticing a child for indecent purposes. He contends that insufficient evidence supports his conviction, that the trial court erred in admitting certain evidence, and that several special conditions of probation imposed by the trial court were unconstitutional and void. For the reasons explained below, we affirm his conviction, vacate some of the special conditions of probation imposed by the trial court, and remand for resentencing.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to the jury's verdict, and the defendant no longer enjoys the presumption of innocence. We do not weigh the evidence or determine witness credibility, but only determine if the evidence was

sufficient for a rational trier of fact to find the defendant guilty of the charged offense beyond a reasonable doubt.

(Citation and punctuation omitted.) *Leaptrot v. State*, 272 Ga. App. 587, 588 (1) (612 SE2d 887) (2005). So viewed, the evidence shows that the 15-year-old victim met Bryan, whom she knew as "Randy," on Facebook sometime in late 2016. In a statement given to a detective, Bryan acknowledged that he reached out to the victim first on Facebook.

The victim testified that she could not remember who initiated contact. They communicated through Facebook, text messages, and by telephone for a few months. She saved Bryan's number in her phone under "RR" because she did not want to get into trouble. A photo sent by Bryan to the victim, which she believes she deleted, was "a younger version . . . in his 20s." The victim's father testified that she was "mentally disabled" and "handicapped" at the time she was communicating with Bryan and taking medication for depression and anxiety.[1]

---

[1] The record contains no other details about the nature of the victim's mental disability or handicap.

The State presented evidence of text messages between the victim's phone and a phone number identified as belonging to Bryan.[2] On January 18, 2017, the victim acknowledged in a text that she had received a "monster" that Bryan left at her mailbox and the two of them discussed a dirt road across the street from the victim's home on a 300-acre tract that "goes pretty far." When the victim stated that she did not think Bryan would actually bring her a "monster," he replied that he was also "really going to fuck" her. The two then engaged in an explicit conversation about what they planned to do with one another sexually. When the victim asked if he brought the "monster" because he loved her, he replied, "Right now I want to get you[r] body in my arms. Then I'll know for sure if I love you. But I am show nuff heading in that direction." When the victim expressed fear that he would not love her after they engaged in intercourse and told him that she loved him,[3] Bryan's replies

---

[2] A woman in her late thirties with whom Bryan had an extramarital affair testified that the phone number to which she texted Bryan in late 2016 and early 2017 was the same as the phone number used to communicate with the victim in this case. She met Bryan through Facebook when he reached out to her, knew him by the name of Randy Bryan, and identified the person that she knew as Randy Bryan as the defendant, Joe Randall Bryan.

[3] At trial, the victim testified that she did not remember telling Bryan that she loved him, but if she had, it was because she was young and "just wanted attention."

were unresponsive on the topic of love. After continued sexually explicit text conversations through January 19, 2017, Bryan texted the victim on January 21, 2017, asked, "Is you[r] daddy gone yet," and declared, "I want your pussy." On January 22, 2017, he stated in a text, "We need to pick a day for you to lay out of school" in order to engage in sexual activity together. The next day, the victim sent a text to Bryan stating that she "need[ed] dick" and asked him to "[c]ome give it to mn [sic]." He asked if she was at home, and when she said that she was not, he told her that it "[g]ot to be at home." The text messages between them from January 24, 2017 through January 27, 2017, were brief and included no references to having sex with one another.[4] In the final text message introduced into evidence, sent on January 27, 2017 at 4:22 p.m., the victim texted Bryan, "Do you hate me[.]"

Late the evening of January 27, 2017, the victim and Bryan made plans to "meet up" the following morning. The victim testified that she did not remember the exact nature of their plan. When Bryan's vehicle stopped in front of her house the following

---

[4] The victim testified that she also talked on the phone with Bryan about sexual things.

morning, the victim walked up to his car. After he asked her a question,[5] he drove to hunting land adjacent to her home, and she walked over and got into his car as they had planned. Bryan told the victim that she was beautiful and attempted unsuccessfully to hug her; he never actually touched her. The victim found his attempt to hug her "scary" and "[w]eird because he was old" and "looked older than in the picture."[6] She testified that Bryan did not drive her anywhere in his car and agreed with the statement "Bryan did not pick you up,[7] you walked to the car"

---

[5] The victim's response to the question about what happened when Bryan stopped in front of her house was inaudible, and the State's follow up question to this inaudible response was "[a]nd where did he go after he asked that question?"

[6] She testified that he did not "look like the same person as the picture" but stated that she thought he was the same person because she "had a feeling that it was him."

[7] During redirect, the State asked the victim what the term "'pick-up'" meant to her, and she replied, "Well, now I know everybody talks different, but back then it wasn't [indiscernible] to hang out." When she was asked to clarify what she meant when she "said that the defendant did not pick [her] up," she said, "we really didn't hang out because my dad came." In his briefs, Bryan cites this testimony for the proposition that the victim "understood" that she was "just going to 'hang out' and not engage in any purported indecent acts." Were we to accept Bryan's characterization of the victim's testimony, we would be derelict in our duty to view the evidence in the light most favorable to the verdict. This we cannot do.

during cross-examination. She also acknowledged that he drove to the hunting land for the purpose of her getting into his car.

The victim's father testified that on January 28, 2017, the victim said she was going to walk and exercise, which struck him as odd because it was unlike her to do this, especially as it was cold outside. The father testified that his suspicions were already raised because he had previously seen a very large bag of Skittles in the mailbox, as well as another bag of the candy and female products in a bag by the mailbox a week or so later. Feeling that "something just wasn't right," the father watched the victim through a window. He saw a car slow down and a light come on "like when you open the door." He jumped in his truck and went in the direction the car had traveled. When he did not see a car in front of him, he glanced down another driveway used by people for hunting and saw a black car. He slammed on his brakes, went down the driveway, parked his truck at an angle to block the car from leaving, and saw his daughter sitting in the car. The victim testified that when her father arrived, Bryan stated, "[O]h shit, I'm in trouble." The father told the victim to get out of the car, told the driver, whom he identified at trial as Bryan, to stay in the car, and called 911. While he was on the 911 call, Bryan begged the father to let him go and

said, "I just want to give her some candy. It's in the trunk. Look in the trunk." When a sheriff's deputy arrived, Bryan told him that he had met the victim on Facebook and was bringing her Skittles.

1. Bryan asserts that the State presented insufficient evidence to support his conviction of enticing a child for indecent purposes because it failed to prove two required elements of the crime. We find no merit in these assertions.

OCGA § 16-6-5 (a) provides: "A person commits the offense of enticing a child for indecent purposes when he or she solicits, entices, or takes any child under the age of 16 years to any place whatsoever for the purpose of child molestation or indecent acts." Over three decades ago, in *Cimildoro v. State*, 259 Ga. 788 (387 SE2d 335) (1990), the Supreme Court of Georgia interpreted this statute as follows:

> The offense described in OCGA § 16-6-5, "enticing a child for indecent purposes," has been held to include the element of "asportation." See, e.g., *Dennis v. State*, 158 Ga. App. 142 (279 SE2d 275) (1981).[8] It does not, however, require "abduction." A child may be "taken" by persuasion, enticement or temptation. The statute itself describes the

---

[8] In *Dennis*, this Court focused on the "taking" language of the definition of enticing a child for indecent purposes in former OCGA § 16-6-5 (a) to conclude that it was not included within an aggravated sodomy offense "which includes no element of asportation." 158 Ga. App. at 142-143 (2).

various ways that a child may be "taken." It provides, "[a] person commits the offense of enticing a child for indecent purposes when he solicits, entices, or takes any child under the age of 14 to any place whatsoever for the purpose of child molestation or indecent acts." O.C.G.A. § 16-6-5.[9] We hold that the "asportation" element[10] of the offense is satisfied whether the "taking" involves physical force, enticement, or persuasion.

(Punctuation omitted.) Id. at 789 (1). Based on this interpretation of "takes" in the statute, the Supreme Court found sufficient evidence to support the appellant's conviction and rejected the appellant's argument that the State was required to prove a physical taking because it had alleged that the defendant "took" the victim in the indictment. Id.

(a) Bryan argues that the State failed to present sufficient evidence of asportation, specifically that he enticed, solicited, or took the victim to another place.

---

[9] Other than changing the relevant age to 16 years from 14 years, this text has not changed since the Supreme Court of Georgia issued its opinion in *Cimildoro*. See Ga. L. 2006, p. 379, § 12.

[10] In *Garza v. State*, 284 Ga. 696 (670 SE2d 73) (2008), the Supreme Court of Georgia explained that "asportation" is also "legal parlance" for "the element of abducting or stealing away the victim" in Georgia's kidnapping statute. (Punctuation omitted.) Id. at 697 (1). The Supreme Court's definition of asportation for kidnapping cases in *Garza* was later superseded by statute. See *Gonzalez v. Hart*, 297 Ga. 670, 672, n.3 (777 SE2d 456) (2015).

We have previously found sufficient evidence of asportation where the victim approaches the defendant in connection with the charged conduct based upon previous interactions between the defendant and the victim. See *Tezeno v. State*, 343 Ga. App. 623, 628 (1) (a) (808 SE2d 64) (2017) (finding sufficient evidence of asportation even though "the victim approached [the defendant] with an offer regarding oral sex on two occasions[;] each of these offers were in response to an earlier offer from [the defendant] that he would give the victim money if he would allow [the defendant] to perform oral sex on him"); *Coker v. State*, 164 Ga. App. 493, 494-495 (1) (297 SE2d 68) (1982) ("The evidence would clearly authorize a finding that appellant, through his attention and telephone calls, solicited and enticed the child . . . into leaving the school grounds and going to his house for sex."). "That the child . . . may have willingly allowed herself to be enticed is of no consequence." (Citation and punctuation omitted.) *Clark v. State*, 323 Ga. App. 706, 708 (747 SE2d 705) (2013). Compare *Henderson v. State*, 303 Ga. App. 531, 534 (2) (694 SE2d 185) (2010) (insufficient evidence of asportation where the defendant joined the victim in her grandmother's bed and no evidence was introduced showing that he "enticed, persuaded, or lured the children into any area of the house").

9

In this case, Bryan enticed the victim to meet with him through his attention, texts, telephone calls, and gifts, as well as his statement that he would know for sure whether he loved her once he had her body in his arms. See *Coker*, 164 Ga. App. at 495 (1) ("Entice means to draw on, by exciting hope and desire; to allure; to attract."). Accordingly, the victim's conduct in walking to and entering Bryan's car provides sufficient evidence of asportation. Id.

(b) Bryan contends that the State's evidence in this case suffers from the same lack of evidence as in *Lasseter v. State*, 197 Ga. App. 498 (399 SE2d 85) (1990), because there was no probative evidence of enticement *and* the present intent to commit indecent acts or child molestation. We disagree.

In *Lasseter*, this Court applied OCGA § 16-2-1 (a)[11] to the crime of enticing a child for indecent purposes and concluded that there must be "sufficient probative evidence that [the defendant] *himself enticed* the victims *onto* the premises with the *present intention* to commit acts of indecency or child molestation after they had been enticed there." (Emphasis in original.) 197 Ga. App. at 498 (1). In that case, the

---

[11] This Code provision provides: "A 'crime' is a violation of a statute of this state in which there is a joint operation of an act or omission to act and intention or criminal negligence."

victims were friends with the appellant's grandson and visited the appellant's home at the invitation of either the grandson or the appellant. Id. While noting that there was evidence that on some occasions, the appellant had the requisite intent to commit acts of indecency or molestation because he had actually committed such acts, we found "no probative evidence that, on any such occasion, it had been appellant, rather than his grandson, who had extended to the victims the invitation to pay a visit to the house." Id. at 499 (1). We then rejected an argument by the State that

> by adducing probative evidence that appellant himself would occasionally invite the victims to the house and probative evidence that he had committed acts of indecency or child molestation on some occasions when the victims were visiting, it met its burden of showing sufficient evidence to authorize appellant's convictions for violating OCGA § 16-6-5 notwithstanding the lack of probative evidence that any of the acts of indecency or child molestation had ever occurred after any of the invitations that had been extended by appellant himself.

Id. We reasoned that under the State's theory, "mere proof that appellant had actually committed an act of indecency or child molestation while the victims were visiting the house would demonstrate that the otherwise innocuous invitations that he had extended on any and all other occasions had been made with the requisite intent" and

11

that it would allow the State to "adduce evidence of the extension of 100 otherwise innocuous invitations for a child to visit with only the last visit resulting in the commission of an act of indecency or child molestation and thereby secure a conviction for 100 counts of enticing a child." Id. Based upon this reasoning, we found that the evidence authorized a finding that the appellant had committed child molestation, but not the separate crime of enticing the victims to the house for indecent purposes. Id. at 500 (1).

We are not persuaded that we should reach the same outcome as in *Lasseter*. Unlike this case, there was no evidence in *Lasseter* of any prior communications between the grandfather and his grandson's friends in which he expressed an intent to commit acts of indecency and child molestation when they met in person. Instead, there was evidence of bare invitations to come to a home that was "an enticing place for the victims to visit because of the swimming pool, their friendship with appellant's grandson and the existence of what the trial court termed 'a generally attractive convivial atmosphere.'" 197 Ga. App. at 498 (1). See also *Phillips v. State*, 354 Ga. App. 88, 92 (1) (840 SE2d 165) (2020) (finding insufficient evidence "that an act of indecency or child molestation was the intended motivation for [the defendant's]

attempted enticement of the victims," with whom he had never previously interacted, to get into his truck).

Here, on the other hand, the text messages between Bryan and the victim provide ample evidence from which the jury could infer that he had a present intent to commit an indecent act or child molestation when he enticed the victim to get into his car in a secluded area. The victim's trial testimony that she did not recall, at that time, the purpose of their meeting that day does not render the evidence insufficient.

> The intent with which an act is done is peculiarly a question of fact for determination by the jury and even when a finding that the accused had the intent to commit the crime charged is supported by evidence which is exceedingly weak and unsatisfactory the verdict will not be set aside on that ground. Intent, which is a mental attitude, is commonly detectible only inferentially, and the law accommodates this.

(Citation and punctuation omitted.) *Howard v. State*, 268 Ga. App. 558, 559 (602 SE2d 295) (2004).

Having found no merit in Bryan's claim that insufficient evidence supports his conviction, we affirm it.

2. Bryan contends that the trial court erred in overruling his authentication objection to State's Exhibits 70-73. State's Exhibit 70 is a "Certification of Records

13

of Regularly Conducted Business Activity" for Pinger, Inc., for attached documents identified as: "A. Pinger Customer Information Sheet for Account ID # 896604889" (State's Exhibit 71) ; "B. Call Data Records for Account ID # 896604889" (State's Exhibit 72) ; and "C. Detailed Message Logs for Account ID # 896604889" (State's Exhibit 73). In Bryan's view, the certification for all of the exhibits "lacks any indicia of reliability due to the lack of a certification under oath, affirmation, and penalty of perjury, by notary or otherwise," and should therefore not have been admitted as a "self-authenticating document." The State contends that the exhibits were properly authenticated under OCGA § 24-9-902 (11).[12] We agree. See *Hayes v. State*, 298 Ga. 98, 100-101, 104 (2) (b) (779 SE2d 2015) (2015) (OCGA § 24-9-902 (11) does not require that submitted certifications of authenticity be notarized or signed under

---

[12] This Code section provides:

The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under paragraph (6) of Code Section 24-8-803 if accompanied by a written declaration of its custodian or other qualified person certifying that the record:

> (A) Was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of such matters;
> (B) Was kept in the course of the regularly conducted activity; and
> (C) Was made by the regularly conducted activity as a regular practice.

penalty of perjury). Having examined the certification at issue and the requirements of OCGA § 24-9-902 (11), we conclude that the trial court did not err by finding that State's Exhibits 70-73 were properly authenticated.

3. Bryan contends that the trial court erred in admitting State's Exhibit 8, a Cellebrite extraction report of data in the victim's cell phone, over his counsel's hearsay and authentication objections. We disagree.

A "trial court's rulings on the admission of evidence [are reviewed] for an abuse of discretion." *McGarity v. State*, 311 Ga. 158, 163 (3) (856 SE2d 241) (2021). As relevant to the admission of the extraction report, the investigator testified that when he interviewed the victim, she provided the password to her cellphone. He opened her phone and placed it in airplane mode to preserve the phone and preclude data from coming into or out of the phone. He explained that he had previously extracted a lot of data from various types of phones and had been doing so for about seven years. In this case, he used the Cellebrite system to perform a "logical extraction, which is what you see is what you get. So if you look on a cell phone and everything that you can see, like, thumbing through it pictures, text messages, and stuff, it pulls that data off." The investigator requested the Cellebrite program to

focus on communications between the victim and a person designated by the victim as "RR" in her phone. State's Exhibit 8 is the extraction report generated by this system. The extracted information appears in a table and is not a screenshot of what appeared in the victim's phone.

The victim testified that the investigator "got [her] phone" and pulled text messages off of her phone. She reviewed Exhibit 8 during her trial testimony and agreed that specific messages in Exhibit 8 refreshed her recollection. Specific messages contained within Exhibit 8 are consistent with the victim's trial testimony about the nature of her communications with Bryan.

(a) *Hearsay*. Bryan contends that the extraction report is hearsay because "[i]t was offered for the truth of the matter asserted—that it accurately lists the dates, times, and contents of communications . . . and that said data was in fact present on [the victim's] phone."[13] This contention has no merit as it overlooks the complete definition of hearsay.

---

[13] Bryan does not assert that the content of the text messages should have been excluded as another layer of hearsay even if the extraction report itself was not hearsay. See, e.g., *Johnson v. State*, 347 Ga. App. 831, 842 (2) (b) (821 SE2d 76) (2018).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OCGA § 24-8-801 (c). Georgia's Evidence Code defines "[d]eclarant" as "*a person* who makes a statement." (Emphasis supplied.) OCGA § 24-8-801 (b). Finally, it defines "[s]tatement" as "(1) [a]n oral or written assertion; or (2) [n]onverbal conduct *of a person, if it is intended by the person as an assertion.*" (Emphasis supplied.) OCGA § 24-8-801 (a). Accordingly, reports generated by a computer program are not considered hearsay as they are not the statements of a person. See, e.g., *Inglett v. State*, 239 Ga. App. 524, 526 (4) (521 SE2d 241) (1999) ("computer-generated data . . . do not constitute out-of-court statements by any person" under the former Evidence Code) (citation and punctuation omitted); *United States v. Lamons*, 532 F.3d 1251, 1263, (II) (A), n.23 (11th Cir. 2008) ("certain statements involve so little intervention by humans in their generation as to leave no doubt that they are wholly machine-generated for all practical purposes"). We therefore find that the extraction report generated by the Cellebrite computer program in this case is not a "statement" made by a "declarant," and therefore is not hearsay. See *Commonwealth v. Ubeda*, 170 NE3d 709, 717 (4) (Mass. App. Ct. 2021) (Cellebrite

17

extraction reports created from cell phone data "are 'computer-generated records,' which do not implicate the rule against hearsay"); *Gayle v. State*, 216 S3d 656, 659-660 (Fla. Dist. Ct. App. 2017) (extraction report of text messages between the appellant and the victim was not hearsay as it was created by a machine that extracted the messages from the victim's phone).[14]

(b) *Authentication*. Bryan asserts that the extraction report was not properly authenticated. We disagree.

"The requirement of authentication or identification as a condition precedent to admissibility shall be satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." OCGA § 24-9-901 (a). "[D]ocuments from electronic sources are subject to the same rules of authentication as other more traditional documentary evidence and may be authenticated through circumstantial evidence." (Citation and punctuation omitted.) *Harris v. State*, 313 Ga.

---

[14] Our opinion in *Ledford v. State*, 239 Ga. App. 237 (520 SE2d 225) (1999) (physical precedent only), superseded by OCGA § 24-8-803 (17), does not require a different result as that case addressed, under the former Evidence Code, whether a spray paint can label could be used to establish that the can contained the chemical toluene. Id. at 238. See *Childers v. State*, 358 Ga. App. 568, 571 (1) (a) (noting *Ledford* was decided before the enactment of OCGA § 24-8-803 (17), which provides hearsay exception for "market reports and commercial publications"). The issue of whether machine-generated reports constitute hearsay was not before us.

872, 880 (4) (874 SE2d 73) (2022). "As with other evidentiary rulings, a trial court's decision to admit a document over an authentication objection is reviewed for an abuse of discretion[,]" id., "and the ruling will not be disturbed on appeal so long as there is some competent evidence in the record to support authentication." (Citation and punctuation omitted.) *Brantley v. State*, 370 Ga. App. 757, 767 (4) (a) (899 SE2d 284) (2024). We have considered each of Bryan's arguments with regard to authentication of the extraction report and cannot say that the trial court abused its discretion in overruling his authentication objections based upon the totality of the evidence presented by the State in this case. See *Glispie v. State*, 335 Ga. App. 177, 184-185 (1) (b) (i) (779 SE2d 767) (2015) (text messages sufficiently authenticated), reversed on other grounds, *Glispie v. State*, 300 Ga. 128, 131 (1) (793 SE2d 381) (2016). See also *State v. Cody*, No. E2022-00947-CCA-R3-CD, 2023 Tenn. Crim. App. LEXIS 522 at *47-51 (IV) (Tenn. Crim App., December 28, 2023) (rejecting argument that Cellebrite extraction report was not sufficiently authenticated based on allegations that investigator "had insufficient personal knowledge of the contents of the text messages, who possessed the cell phones at the time the messages were sent, and knowledge of the content described within the messages, or whether the messages

even occurred"); *Smith v. State*, No. 0332, 2015 Md. App. LEXIS 233 at *25 (I) (Md. Ct. Spec. App. July 7, 2015) (rejecting argument that Cellebrite report not sufficiently authenticated where detective reviewed text messages from phones and testified the exhibit was "'prepared from the download'").[15]

4. Bryan's claim that he is entitled to a new trial based upon cumulative harm has no merit as there are not multiple errors from which to assess cumulative harm in this case. See *Branch v. State*, 361 Ga. App. 86, 92 (6) (863 SE2d 349) (2021).

5. Bryan asserts that five of the special conditions of probation imposed by the trial court are unconstitutional and void. We agree that some of the conditions imposed by the trial court must be vacated.

> A trial court has broad discretion in sentencing to impose conditions reasonably related to the nature and circumstances of the offense and rehabilitative goals of probation. But such conditions must

---

[15] Our opinion in *Smoot v. State*, 316 Ga. App. 102 (729 SE2d 416) (2012), overruled on other grounds, *Hill v. State*, 360 Ga. App. 143, 146, n.4 (860 SE2d 893) (2021), decided under the former Evidence Code, does not mandate a different outcome. At the time *Smoot* was decided, the proponent was required to tender "proof of the authenticity or genuineness of the writing." (Citation and punctuation omitted.) *Smoot*, 316 Ga. App. at 109 (4) (a). "OCGA § 24-9-901 departs from the former Evidence Code[,]" *Nicholson v. State*, 307 Ga. 466, 476 (5), n.6 (837 SE2d 362) (2019), and requires only "evidence sufficient to support a finding that the matter in question is what its proponent claims." OCGA § 24-9-901 (a).

be stated with reasonable specificity to afford the probationer notice of the groups and places he must avoid. And the conditions must not be so broadly worded as to encompass groups and places not rationally related to the purpose of the sentencing objective.

(Citation and punctuation omitted.) *Bryant v. State*, 363 Ga. App. 349, 352 (2) (870 SE2d 33) (2022). In this case, the following special conditions of probation fail to satisfy this test:

1. **Contact with Minors/Incidental contact with Minors**. You shall have no contact, whether directly in person or indirectly through any means of communication or through employment, volunteer activity or otherwise with any child under the age of eighteen (18), including your own children, nor with any person unable to give consent because of mental or emotional limitations. Neither shall you attempt contact with the aforementioned except under circumstances approved in advance and in writing by the Court. If you have incidental contact with children, you will be civil and courteous to the child and immediately remove yourself from the situation. You will discuss the contact at your next meeting with your Community Supervision Officer.[16]

---

[16] See *Bryant*, 363 Ga. App. at 352-354 (2) (finding nearly identical condition "so overbroad and lacking in specificity that it could be applied to prohibit [appellant] from shopping at virtually any store, visiting any restaurant, or literally going to any other location in which [appellant] would come into contact with the general public" and also "so broadly worded as to encompass groups and locations not rationally related to the purpose of the sentencing objective") (citations and punctuation

6. **Images of Minors**. Except as authorized by the court or the Community Supervision Officer, you shall not create, possess, access or control any type of photograph, video, rendering, or digital imagery of any minor.[17]

7. **Relationships**. You shall not date or marry anyone who has children under the age of eighteen (18), unless approved in advance and in writing by the Community Supervision Officer in consultation with the treatment provider or the sentencing court. You are required to notify any such person of your criminal history.[18]

---

omitted). We are unpersuaded by the State's attempt to distinguish *Bryant* by pointing out that the special condition in this case adds the words "or through employment, volunteer activity or otherwise" after the words "indirectly through any means of communication" that appeared in *Bryant*.

[17] See *People v. Lopez*, No. F068109, 2015 Cal. App. Unpub. LEXIS 6058 at *14 (Cal. Ct. App. 2015) (finding probation condition was overly broad where it prohibited possession of pictures of *any* children).

[18] This special condition is overly broad as it would impose a restriction with regard to persons with minor children "whether that [person] even has a relationship or any contact with the child." *Konsdorf v. State*, 94 NE3d 752 (III) (B) (Ind. Ct. App. 2017) (unpublished) (finding following special condition prohibition overly broad in its goal of protecting children because it mandated "twice over" permission "based merely on [an] adult's parenthood": "You shall not engage in a sexual relationship with any person who has children under the age of 16 years unless given permission by the court and your treatment provider."). See also *People v. Moses*, 199 Cal. App. 4th 374 (III) (D) (Cal. App. Ct. 2011) (finding probation condition prohibiting appellant from dating or marrying anyone with children under the age of eighteen,

8. **Sexually oriented material**. You shall not possess or subscribe to any sexually oriented or sexually stimulating material to include mail, computer or television, nor patronize any place where such material or entertainment is available.[19]

---

unless approved in advance and in writing by probation officer, vague and overbroad). Compare *United States v. Cortez*, 543 Fed. Appx. 411, 412 (5th Cir. 2013) (upholding, under plain error review, a special condition "conditionally restricting [the defendant] from dating or befriending anyone with children under the age of 18 who live at home").

[19] See *United States v. Adkins*, 743 F3d 176, 194-196 (II) (G) (ii) (7th Cir. 2014) (striking probation condition precluding defendant from "'view[ing] or listen[ing] to any pornography or sexually stimulating material or sexually oriented material or patroniz[ing] locations where such material is available'" because it is vague and overbroad).

> Read literally, this provision might preclude [Bryan] from using a computer or entering a library—irrespective of what he views in either place—because both are "locations" where "sexually stimulating material is available." . . . More practically, how can we tell which images or voices are sexually stimulating for [Bryan]?

Id. at 194 (II) (G) (ii). Our opinion in *Ellis v. State*, 221 Ga. App. 103 (470 SE2d 495) (1996), does not control as it dealt with a prohibition against possessing "'sexually explicit' material" rather than "sexually stimulating material." Id. at 105 (3). And while we addressed an identical provision in *Rutledge v. State*, 360 Ga. App. 824 (861 SE2d 793) (2021), we expressly noted that the only issue before us was whether the probation condition violated the appellant's free speech rights and that we were *not* addressing whether the condition "was vague or overly broad in any other respect." Id. at 827 (1) (a), n.2.

9. **900 Numbers**. . . . You shall not utilize "900" telephone numbers . . . without prior written permission from your Community Supervision Officer.[20]

On the other hand, we find no merit in Bryan's contention that the first portion of Special Condition 9 prohibiting him from renting a post office box without prior written permission from his probation officer is vague and overly broad.[21] In light of these holdings, we must vacate Special Conditions 1, 6, 7, 8, and the second portion of Special Condition 9 relating to 900 numbers and remand this case to the trial court for resentencing. We affirm the portion of Special Condition 9 relating to post office boxes.

*Judgment affirmed in part, vacated in part and case remanded for resentencing. Dillard, P. J., and Padgett, J., concur fully in Divisions 1-4 and concur in judgment only as to Division 5.*

---

[20] While a probation condition prohibiting against the use of "'900' telephone sex lines" has previously been upheld in a case involving a rape conviction, *State v. Bullplume*, 305 P3d 753, 756, 759-760 (Mont. 2013), we have found no authority authorizing a broad prohibition against contacting any type of "900" number, whether with or without permission of a probation officer.

[21] See *United States v. Thompson*, 888 F3d 347, 355 (II) (E) (8th Cir. 2018) (upholding similar condition of probation relating to mailbox).